Argued and submitted May 19, resubmitted In Banc December 9, affirmed in part, reversed in part and remanded December 29, 1982, respondents Phyllis J. Potter's and Bureau of Labor's reconsiderations granted, affirmed as modified August 17 (64 Or App 341, 668 P2d 433), Phyllis J. Potter's reconsideration denied October 7, petitions for review allowed October 25, 1983 (295 Or 840)

See later issue Oregon Reports

# CITY OF PORTLAND,
*Petitioner,*

*v.*

# BUREAU OF LABOR AND INDUSTRIES et al,
*Respondents.*

## (No. 29-78, CA A21748)

656 P2d 353

Richard A. Braman, Office of City Attorney, Portland, argued the cause and filed the brief for petitioner.

Daryl Dodson Wilson, Assistant Attorney General, Salem, argued the cause for respondent Bureau of Labor and Industries, Mary Wendy Roberts, Commissioner. With her on the brief were Dave Frohnmayer, Attorney General, Stanton F. Long, Deputy Attorney General, William F. Gary, Solicitor General, and Virginia L. Linder, Assistant Attorney General, Salem.

Charles J. Merten, Portland, argued the cause for respondent Phyllis J. Potter. With him on the brief were Richard S. Yugler, James R. Appel, and Merten & Fink, Portland.

VAN HOOMISSEN, J.

Thornton, J., concurring in part; dissenting in part.

## VAN HOOMISSEN, J.

The City of Portland petitions for judicial review of an order of the Commissioner of the Bureau of Labor and Industries (Commissioner) that found that the city had committed unlawful employment practices in violation of former ORS 659.030(1) and (4)[1] and awarded claimant back pay of $19,288 with interest, plus $15,000 for mental suffering.

Claimant was employed by the city as a Police Records Clerk II (PRC II). In 1971, she was assigned to one of two desk positions in the front office at the East Precinct. Both positions were formerly held by male police officers. The city had decided to fill one of the positions with a civilian employe as an economy measure. The other position continued to be filled by a male police officer, who earned a higher salary than a PRC II. The responsibilities of both the officer and claimant involved answering the telephone, dealing with the public and a variety of clerical tasks. Between 1971 and 1976, claimant and Officer Arata were assigned to the positions. In 1976, Arata retired. He was replaced by Officer Schuette, who remained throughout the remainder of claimant's tenure at the East Precinct.

Claimant first publicly aired her dissatisfaction with her lower pay in a letter to the *Rap Sheet,* the Portland Police Association's newsletter. She later filed two formal complaints with the Commissioner, the first alleging unlawful discrimination because of sex, former ORS 659.030(1), and the second alleging retaliation by her employer because of her complaint. Former ORS 659.030(4). After an unsuccessful attempt at conciliation, the Commissioner brought specific charges. A hearing was held, resulting in a proposed order. Later, the Commissioner issued the order that is the subject of this judicial review.

■ The city's first assignment of error rests on a claimed conflict between two statutes, the so-called Equal Pay Act, ORS 652.210 to 652.230, and the Fair Employment Practices Act, ORS 659.010 to 659.110. The Equal Pay Act states:

---

[1] The relevant language of that statute remains in revised form. *See* ORS 659.030(1)(a), (b), and (f).

"(1)   No employer shall:

"(a)   In any manner discriminate between the sexes in the payment of wages for work of comparable character, the performance of which requires comparable skills.

"(b)   Pay wages to any employe at a rate less than that at which he pays wages to his employes of the opposite sex for work of comparable character, the performance of which requires comparable skills." ORS 652.220(1).

The Fair Employment Practices Act, during the relevant period, stated:

"* * * [I]t is an unlawful employment practice:

"(1)   for an employer, because of the race, religion, color, sex or national origin of any individual * * * to refuse to hire or employ or to bar or discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment. * * *" ORS 659.030(1) (1975).[2]

The asserted conflict arises because a municipality such as the city, although specifically included under chapter 659, see ORS 659.010(6),[3] is specifically excluded from coverage under chapter 652. See ORS 652.210(1).[4] Any violation of the Equal Pay Act would also appear to violate the more general provisions of the Fair Employment Practices Act, yet a municipal employer is exempted from the prohibitions of one act while included in those of the other. The city urges that we resolve this apparent conflict by applying the rule that a specific statute controls over a

---

[2] The Fair Employment Practices Act, as enacted in 1953, prohibited employment discrimination only because of race, religion, color or national origin. In 1969 it was amended to include discrimination because of sex. Or Laws 1969, ch 618, § 3. The Equal Pay Act was enacted in 1955. Or Laws 1955, ch 193.

[3] ORS 659.010(6):

"(6) 'Employer' means any person, including state agencies, political subdivisions and municipalities, who in this state, directly or through an agent, engages or utilizes the personal service of one or more employes reserving the right to control the means by which such service is or will be performed." (Emphasis supplied.)

[4] ORS 652.210(1):

"(1) 'Employer' means any person employing one or more employes, but does not include the state, or any municipal corporation or political subdivision of the state having in force a civil service system based on merit, or the Federal Government." (Emphasis supplied.)

general one. ORS 174.020;[5] *Thompson v. IDS Life Ins. Co.,* 274 Or 649, 549 P2d 510 (1976). Stated differently, the city argues that, because every Equal Pay Act violation also violates the Fair Employment Practices Act, unless we construe the latter, which encompasses more conduct than the Equal Pay Act, to exclude governmental employers from actions involving equal pay for comparable work, the statutory exclusion of public employers in chapter 652 would be meaningless. We must endeavor to avoid a construction which renders a statute ineffective. *Vaughn v. Pacific Northwest Bell Telephone,* 289 Or 73, 83, 611 P2d 281 (1980).

The result of the construction urged upon us by the city would be that, although a governmental employer would continue to be subject to actions alleging sex discrimination in other contexts, such as in hiring and firing, it would be immune from actions alleging pay discrimination. Such a construction, however, would appear to render meaningless the portion of the Fair Employment Practices Act that prohibits discrimination because of sex "in compensation or in terms, conditions or privileges of employment." ORS 659.030(1) (1975).

The Commissioner resolved the apparent conflict by finding that the 1969 amendment to the Fair Employment Practices Act that added sex as an impermissible ground for discrimination implicitly repealed the governmental employer immunity of the Equal Pay Act. We need not go so far. Even though one might not be able to think of any conduct that would violate the Equal Pay Act without also violating the Fair Employment Practices Act, the two statutes are not perfectly congruent. The Equal Pay Act offers a claimant somewhat broader *remedies.* For example, it provides for the automatic recovery of twice the amount of wrongfully unpaid wages, ORS 652.230(1), and for a mandatory award of attorney fees. ORS 652.230(2). The Fair Employment Practices Act provides only for attorney fees in the discretion of the court, ORS 659.121(1),

---

[5] ORS 174.020:

"In the construction of a statute the intention of the legislature is to be pursued if possible; and when a general and particular provision are inconsistent, the latter is paramount to the former. So a particular intent shall control a general one that is inconsistent with it."

and it contains no provision for liquidated damages. Also, the Equal Pay Act expressly provides for maintenance of an action on behalf of similarly situated employees, while the Fair Employment Practices Act does not. Furthermore, at the time claimant filed her complaint, ORS 659.121 did not exist. She therefore had no statutory authority for an action directly against her employer but was required to proceed through the Bureau of Labor and Industries. It thus appears that, although governmental employers are subject to actions for pay discriminations under chapter 659, their immunity under chapter 652 continues to have some effect in that it exempts them from the broader remedial provisions of that statute. We reject the city's contention.

The Commissioner stated:

" * * * [the city's] classification system in effect did discriminate on the basis of sex herein, in maintaining two sex-segregated classifications with different rates of pay when workers from each classification performed substantially the same work."

The city contests that finding. To uphold it, we must find that it is supported by substantial evidence in the record. ORS 183.482(8)(c).

To support a finding of discrimination, the Commissioner produced a lengthy order. The "Findings of Fact" section of that order, that for the most part describes the job duties of the claimant and the male officers who performed the same duties, concludes:

"Male persons were allowed to apply for appointment to Respondent's PRC-II classification at all times material herein. Female persons were allowed to apply for appointment to Respondent's police officer classification as of 1973.

"In October, 1974, 492 of Respondent's 508 police officers, or 97%, were male. In July, 1975, 480 of Respondent's 497 police officers, or 97%, were male. In July, 1976, 450 of Respondent's 474 police officers, or 95%, were male.

"In July, 1974, one of Respondent's PRC-II's, or 4%, was male. In July, 1975, none of Respondent's PRC-II's were male. In July, 1976, none of Respondent's PRC-II's were male."

That is the only portion of the findings that deal with the sex of claimant and her male co-workers. They contain no finding of *de jure* segregation by sex during the relevant period.

■ We find a complete absence of evidence in the record to support a finding that the city in any way brought about the *de facto* segregation by sex that existed and thus was, in the Commissioner's words, "maintaining two sex-segregated job classifications." There is only the conclusory statement in the Commissioner's "Ultimate Findings of Fact" that "[t]he net effect of the circumstances set out in the Findings of Fact above was that claimant was discriminated against in terms of her compensation because of her female sex." Nothing in the record indicates that the city was any more responsible for the fact that, by and large, police officers were male and PRC-IIs were female than other possible explanations, *e.g.*, the sex of applicants.[6] Furthermore, nothing shows that the city engaged in discriminatory hiring when it filled PRC II positions, and the Commissioner made no such finding.

The only other way that the city might have discriminated against claimant because of her sex would be if its decision to replace police officers with civilians was made not as an economy measure, but because the civilians were females. Nothing in the record or the Commissioner's order indicates that such was the case, nor does anything indicate that any of the city officials who made the decision to replace officers with civilian employees were even aware that most PRC IIs were female. The Commissioner's "Conclusion of Law" on the issue was:

"(6) Respondent committed an unlawful employment practice in violation of ORS 659.030 (1)(a) by discriminating against Complainant in compensation because of Complainant's female sex in the following particular:

"From July 15, 1971 to December 23, 1976, Respondent compensated Complainant at a rate lower than that paid its male employees Arata or Schuette even though Complainant performed substantially equal work, requiring

---

[6] The Commissioner's brief admits that "[o]nly a [classification] system which does not discriminate on the basis of sex removes employer liability for payment of different wages to workers of different sex for performance of substantially equal work."

substantially equal skill, effort and responsibility, under similar working conditions, to the work performed by Officers Arata and Schuette."

We disagree that that alone amounts to discrimination in employment "because of sex."

The Commissioner argues that the the city failed "to establish that the city's 'merit system' was anything other than a pretext for discriminatory pay practices." The claimant bore the burden of proof on that issue. There is no evidence that the use by the city of a job classification to accomplish its aims was a pretext for job discrimination based on sex.

■　　　Employment discrimination is rarely susceptible of direct proof, and proof of discrimination frequently depends on inferences drawn by the finder of fact from other evidence. Here, claimant produced no direct evidence of discrimination, and the city came forward with a non-discriminatory explanation for the pay disparity, *i.e.,* its civil service classification system. The Commissioner has failed to make explicit her theory of discrimination. Finding a complete absence of evidence to support a finding that the city discriminated against claimant *"because of"* her sex in violation of former ORS 659.030(1)(a), we reverse that portion of the Commissioner's order that awarded damages for the pay disparity.

■　　　Claimant's retaliation claim presents a totally distinct issue. ORS 659.030(4) made it an unlawful employment practice for an employer

" * * * to discharge, expel or otherwise discriminate against any person because he has opposed any practices forbidden by this section or because he has filed a complaint, testified or assisted in any proceeding under ORS 659.010 to 659.110 and ORS 659.400 to 659.435."

Here, we find ample evidence to support the Commissioner's finding that the city violated ORS 659.030(4) by harassing, discrediting and otherwise retaliating against claimant, because she opposed the city's employment practices and had filed a complaint with the Bureau of Labor and Industries. The claimant was subjected to several incidents of mental abuse and humiliation by different employes of the city, each of whom, it can be inferred, had

knowledge of her formal and informal allegations of discrimination. The Commissioner was entitled to draw the inference that these incidents were the result of, and in retaliation for, claimant's allegations.

Claimant's letter to the *Rap Sheet,* complaining about discriminatory pay practices, appeared in April, 1975. She first filed a complaint with the Commissioner in July, 1976. Before her letter to the *Rap Sheet,* she had received consistently favorable work evaluations. The evaluation which immediately preceded her letter to the *Rap Sheet* was dated March 18, 1975, and covered the period from October 1, 1974, to April 1, 1975. She was rated "competent" or "superior" in every category, with an overall "competent-plus" evaluation. Apparently after the *Rap Sheet* letter appeared, the reviewing officer added an unfavorable parenthetical comment to that evaluation.[7] The officer testified that he had added the comment to "protect" claimant from criticism being directed her way.

On April 29, 1975, claimant received an official reprimand from the Chief of Police. It resulted from an incident that occurred on April 17, 1975, in which an officer asked her to take custody of a purse. She testified that she had asked the officer to "please wait a minute," because she was busy with incoming phone calls. The officer gave the purse to an employe of the traffic division. This apparently trivial incident resulted in claimant being called into Captain Brown's office, where he accused her of lying, and later in an official reprimand from the Chief of Police. Officer Arata testified that in his 33 years' service he had never heard of anyone being formally disciplined for telling an officer to wait. Claimant succeeded, through a union grievance procedure, in having the reprimand expunged from her record.[8] She could not be sure that Captain Brown,[9] the

---

[7] The unfavorable additional comment, added to the report after claimant had read and signed it, stated

"Mrs. Potter is overly conscientious if that is possible. It sometimes annoys her co-workers and slows her activities."

[8] The grounds for the expunction are unclear. Claimant testified that she could not remember the grounds. The city contends that the absence of counsel or union representative at claimant's interview with the officer who recommended discipline was the reason for the expunction. The portion of the transcript cited by the city as authority for this contention does not support the contention.

[9] Captain Brown was deceased by the time of the hearing.

disciplinary officer, was aware of her letter to the *Rap Sheet,* but that letter was a source of controversy at the precinct, and it is reasonable to infer that Brown knew of it.

On May 22, 1976, Brown sent claimant a letter instructing her to see him in his office on May 26. The letter stated:

> "Since this interview may involve the possibility of disciplinary action, you are advised you have the option of arranging to have your union representative present during the interview."

In the days preceding the interview, claimant suffered anxiety and sleepless nights. At the interview, Brown loudly harassed and badgered her over a rebuttal she had written to an unfavorable job evaluation. It turned out that, although Brown's letter implied that a disciplinary action against claimant was to be discussed at the meeting, the possible disciplinary action was actually against Lieutenant Haven, the officer who had written the evaluation, in that Brown construed claimant's rebuttal as an accusation that Haven had made a false report. Haven testified that Brown had told him "as a joke" that there was a possibility of disciplinary action against him. The Commissioner found that

> " * * * neither Captain Brown nor Lieutenant Haven took seriously the possibility of disciplinary action against Lieutenant Haven, but that the May 26, 1976 meeting was actually called to harass Complainant."

Substantial evidence in the record supports this conclusion.

After claimant filed her complaint with the Commissioner in July, 1976, she received her worst job evaluation. It was prepared by Sergeant Cunningham, who was aware that she had filed a complaint. He prepared his evaluation on the basis of entries in a notebook he kept. The first three pages of the notebook contained only unfavorable entries relating to her. The Commissioner found that "[t]he purpose of the notebook * * * was to build a case against Complainant rather than to provide a basis for formulating a subsequent evaluation." This was a reasonable inference the Commissioner was entitled to draw. The fact that her job evaluations were uniformly positive

up until her complaint of discrimination but deteriorated afterwards, coupled with the testimony of Officer Arrata that her job performance did not change over the same period, supports an inference that the negative evaluations were in retaliation for her allegations. The Commissioner so found, and substantial evidence in the record supports that finding.

Finally, there was an incident in which claimant was directed to investigate a paper bag left at one of the doors of the precinct. Officer Schuette volunteered to investigate the bag after claimant spotted it on her video monitor, but he was stopped by Brown, who told him, without giving any reason, to have claimant investigate, because she had "had bomb training." Brown berated her for her hesitancy in examining the bag.

Claimant had an unblemished work record before she complained of discrimination. Afterwards, she received poor evaluations and was singled out for harassment and criticism totally disproportionate to the incidents purported to be the reason for the harassment and criticism. The inference is permissible that those actions constituted retaliatory action. *See Lewis and Clark College v. Bureau of Labor,* 43 Or App 245, 602 P2d 1161 (1979), *rev den* 288 Or 667 (1980). The Commissioner concluded that:

> "In light of the close correlation in time between Complainant's letter opposing Respondent's sex discrimination in compensation and her first receipt of an adverse work evaluation; Captain Brown's animus toward Complainant because of this opposition; the withdrawal of the duty of evaluating Complainant from a supervisor who had given her a favorable evaluation in the past; and the facts that Complainant's suddenly adverse job evaluations were not based upon a decline in the quality of her work, and that Complainant's superiors did not offer her suggestions as to how she could improve; Complainant's receipt of nothing but adverse job evaluations after the publication of her letter, her receipt of obviously unjust discipline, Captain Brown's haranguing of her in person and in writing and the continuous other negative actions against her by her supervisors must be seen as deliberate attempts to discredit and harass Complainant in retaliation for her April, 1975 letter and her July, 1976 complaint to the Civil Rights Division alleging Respondent's sex discrimination in compensation."

There is substantial evidence in the record to support the Commissioner's findings that the city violated former ORS 659.030(4).

■    The city finally argues that the Commissioner erred in awarding claimant $15,000 as compensation for mental suffering "and to serve the statutory purpose of eliminating employment discrimination."[10] The city first contends that the Commissioner lacked authority to make an award for this latter purpose. The Commissioner had authority to award damages as compensation for mental anguish and humiliation. *Fred Meyer v. Bureau of Labor*, 39 Or App 253, 262, 592 P2d 564, *rev den* 287 Or 129 (1979). We need not now decide whether she also has authority to award damages for the sole purpose of eliminating discrimination.

■    The city also argues that there was an absence of substantial evidence to connect claimant's mental suffering with the city's retaliatory actions. This argument lacks merit. Claimant testified at length concerning her reaction, anguish, sleeplessness and humiliation after her official reprimand and after her meeting with Brown. She had felt "totally drained" after being harassed by Brown and had suffered crying spells. Dr. Moss had examined her, and his report supported her testimony. Any evidence of anguish caused by discrimination will support a finding such as was made here. *Gaudry v. Bureau of Labor & Ind.*, 48 Or App 589, 593, 617 P2d 668 (1980). However, because the damage award was based on "[the city's] unlawful employment practices" which necessarily included the allegedly unlawful pay disparity, we remand the damage award for reconsideration.

Affirmed as to the retaliation claim; reversed as to the discrimination claim; remanded for reconsideration of the damage award.

---

[10] The city does not raise the question of the Commissioner's authority under ORS 659.121 to award damages in excess of $200. *See* Or Const, Art I, § 17, and Art VII (Amended), § 3; *Fred Meyer v. Bureau of Labor*, 39 Or App 253, 270, 592 P2d 564, *rev den* 287 Or 129 (1979) (Buttler, J., specially concurring); *but see Williams v. Joyce*, 4 Or App 482, 479 P2d 513, *rev den* (1971).

**THORNTON, J.,** concurring in part and dissenting in part.

Contrary to the majority, it is my conclusion that petitioner was entitled to raise a defense or an exemption under the Equal Pay Act in the instant case. ORS 652.210(1). Further, in my view, the Equal Pay Act and the Fair Employment Practices Act are not inconsistent. They address different problems in different fashions. The Equal Pay Act was designed to remedy a problem in employment based on the now outmoded belief that a man, supposedly because of his role in society, should be paid more than a woman, even though his duties are the same. It was not clear at the time the Equal Pay Act was adopted that courts would consider pay differentials between men and women to be discrimination based on sex. The Equal Pay Act removed this question from judicial scrutiny. Thus, that Act used particular language to meet a special problem. The Act also contains a number of defenses and a specific exemption. Public employers having a civil service system based on merit are exempted. The Act does not apply if the pay differential is a consequence of a seniority system which does not discriminate on the basis of sex and if the differential is based in good faith on factors other than sex.

The Fair Employment Practices Act was designed to prevent discrimination in employment based on race, religion, color, sex, national origin or age. It prohibits discrimination on these bases in barring from employment, hiring, firing, compensation and terms and conditions of employment. As the preamble to the Act indicates, it is based on a policy to prohibit employment practices based on arbitrary criteria.

These two acts are essentially independent of each other, although they should be read in *pari materia*. Nothing in the legislation prohibits an injured employe from seeking redress under both. If the conduct violates both, then remedies can be had under both—but not overlapping or double remedies for the same wrong. Reading the acts together, I conclude that a pay differential based on sex violates the Fair Employment Practices Act only if it violates the Equal Pay Act. Simply because a complaint brought under the Fair Employment Practices Act alleges

discrimination in compensation on the basis of sex does not prevent the employer from raising a defense or an exemption provided under the Equal Pay Act.

Even assuming, *arguendo,* that an ambiguity arises by virtue of the failure of the legislature to mention the exemption of governmental bodies under the Equal Pay Act when amending the Fair Employment Practices Act in 1969 (Or Laws 1969, ch 618, § 3) to cover sex discrimination, this contention is answered by the well-established rule of construction embodied in ORS 174.020:

> "In the construction of a statute the intention of the legislature is to be pursued if possible; and when a general and particular provision are inconsistent, the latter is paramount to the former. So a particular intent shall control a general one that is inconsistent with it."

The same rule was stated in slightly different language in *Thompson v. IDS Life Ins. Co.,* 274 Or 649, 549 P2d 510 (1976):

> "* * * [A] specific or special act controls over a general act. This is the rule even if, as here, the general act was enacted later. * * * Absent a plain indication of intent to repeal the special act, the special act will continue to have effect and the general act will be modified by construction so the two can stand together; one as the general law of the state and the other as the law of the particular case or as an exception to the general rule." 274 Or at 656. (Citations omitted.)

If we were to say, as the prevailing opinion concludes, that complainant's claim is allowable under the Fair Employment Practices Act without reference to the exclusions provided under the Equal Pay Act, the latter would be a nullity. Contrary to the view expressed in that opinion, I am satisfied that, if the legislature had intended to eliminate from the Equal Pay Act the exclusion of municipal corporations having in force a civil service system based on merit, it would have done so. As this court observed in *Corvallis Disposal v. Bureau of Labor,* 49 Or App 245, 248 n 3, 619 P2d 663 (1980), *rev den* 290 Or 651 (1981), which also involved construction of a provision of the civil rights - anti-discrimination laws:

> " * * * [I]n the 1973 legislation the legislature demonstrated that it was able to call an unlawful employment

practice an unlawful employment practice when it wanted to. * * *"

Summarizing, I concur with the majority in affirming on complainant's retaliation claim. I dissent, however, as to complainant's claim under the Equal Pay Act.

Richardson, Warren and Young, JJ., join in this dissenting opinion.