Argued and submitted January 24, affirmed in part, reversed in part October 30, 1984

### CITY OF PORTLAND,
*Respondent on Review,*

*v.*

### BUREAU OF LABOR AND INDUSTRIES et al,
*Petitioners on review.*

(No. 29-78; CA A21748; SC 29961, 29380)

690 P2d 475

Michael D. Reynolds, Assistant Attorney General, Salem, argued the cause for petitioner on review Bureau of Labor and Industries. With him on the briefs were Dave Frohnmayer, Attorney General, Stanton F. Long, Deputy Attorney General, William F. Gary, Solicitor General, Virginia L. Linder,

Assistant Attorney General, and Daryl Dodson Wilson, Assistant Attorney General, Salem.

Charles J. Merten, Portland, argued the cause for petitioner on review Phyllis J. Potter. With him on the briefs were Richard S. Yugler, James R. Appel, Karen L. Fink and Merten & Fink, Portland.

Richard A. Braman, Deputy City Attorney, Portland, argued the cause and filed briefs for respondent on review.

LENT, J.

**LENT, J.**

This case arises from a complaint by a female employe that her employer discriminated against her "in compensation" on the basis of her sex, *i.e.,* her gender. Two separate statutory schemes are implicated, namely, the Equal Pay Act, ORS 652.210 to 652.230, and the Fair Employment Practices Act, ORS 659.010 to 659.110.

Phyllis J. Potter (Potter) filed with the Commissioner of the Bureau of Labor (Commissioner) a complaint that her employer, the City of Portland (City), paid her a lower salary than it paid to certain male employes for doing the same work. The Civil Rights Division of the Bureau of Labor (Bureau), pursuant to the Fair Employment Practices Act, investigated the matter and determined that there was substantial evidence that Potter was paid wages which were less than those paid to similarly situated male employes for performance of substantially equal work. Notice of that determination was given, and the Civil Rights Division unsuccessfully attempted to resolve Potter's complaints with the City. The Commissioner of Labor then prepared specific charges against the City of unlawful discrimination based upon sex, alleging that this was done pursuant to ORS 659.060(1) of the Fair Employment Practices Act. In pertinent part, the Commissioner charged:

> "During the period from on or about July 15, 1971 to on or about December 23, 1976, the Complainant, a female person, performed equal work or work of a character comparable to the work performed by two male employes of Respondent, Police Officers Arata and Schuette, which work was performed under similar working conditions and required equal effort, skill and responsibility. However, the Respondent, because of the Complainant's female sex, compensated the Complainant at a rate lower than that paid to Police Officers Arata and Schuette. During this same period, Respondent, because of the Complainant's female sex, accorded to the Complainant fewer and lesser perquisites than those accorded Police Officers Arata and Schuette, and otherwise further discriminated against the Complainant in regard to the terms, conditions and privileges of her employment."

The City denied that it had discriminated and alleged several "affirmative defenses." We summarize those pertinent to the issues in this court.

The first affirmative defense alleged the existence of both the Equal Pay Act and the Fair Employment Practices Act, that the statutes were "inconsistent" because there were defenses available to an employer under the former that were not available under the latter, and that the Commissioner had "no jurisdiction" of the subject matter of the charges under ORS chapter 659.

The second affirmative defense was that the charges did not "allege an unlawful employment practice under the provisions of ORS chapter 659."

The third affirmative defense was that the City had in force a "civil service system based on merit."

The fourth affirmative defense was that Potter was in one civil service classification and the male employes in another classification and that the difference in compensation paid to the employes "resulted from the fact that they held positions in different classifications, not from the fact complainant is female."

The fifth affirmative defense was that under the City's charter the Civil Service Board was an independent commission, not subject to control by the City Council, that the Board administered the civil service system established by the charter, that the employes involved were compensated according to the classification established in the civil service system and that the City had no power or authority to compensate Potter at any rate not established by the classification system.

An extensive hearing on the charges was conducted before the Commissioner's designee, and after all of the evidence had been presented, the Commissioner made certain findings of fact, which we summarize as follows.

Potter was employed by the City to work for the Portland Police Department as a Police Records Clerk (PRC). In 1971 she was promoted to PRC II and assigned to one of two front desk positions at the East Precinct. She was the first woman assigned to the desk at the precinct. The positions had previously been filled by male police officers. The assignment of a civilian employe was an economy measure; a PRC II was paid at a lower rate of compensation than was a police officer. From 1971 to 1976 Potter shared the duties of the desk with

Officer Arata, a male. In 1976 she shared the desk with Officer Schuette, a male. Various other police officers worked the desk on Potter's and the officers' days off. The job involved assisting the public on the telephone and at the counter, and a variety of clerical tasks.

The duties of the desk positions were not reallocated when Potter assumed the position, except that she did some typing not done by her predecessor. The major duties of the desk positions remained the same from 1971 through 1976. Differences between the work done by Potter and the officers were so minor that they constituted an insigificant part of the desk jobs. The officers neither supervised nor evaluated Potter. The physical working conditions of all desk persons were virtually identical. Police officers received a base salary determined by length of service, with a ceiling after five years of service. PRC IIs received a base salary determined by length of service, with a ceiling after one year of service. Males could become PRC IIs at all material times. Females could become police officers as of 1973. From 1971 through 1976, no fewer than 95% of police officers were men and no fewer than 96% of PRC IIs were women.

The Commissioner's findings of ultimate fact included:

"2) For the most part, [Potter], William Arata, and Bernard Schuette worked the same job. They shared the major responsibility of their job for reception and were essentially interchangeable. With minor exceptions, they shared the responsibility for and spent the same time accomplishing their other tasks. Theoretical differences in their responsibilities related only to responsibilities which were rarely if ever exercised. No significant distinction was made between the actual duties and responsibilities of [Potter], William Arata and Bernard Schuette. In conclusion, [Potter], William Arata and Bernard Schuette did substantially equal work, the performance of which required substantially equal skills, efforts, and responsibilities under similar working conditions.

"3) During her employment as East Precinct desk person, [Potter] was classified as a Police Records Clerk II and compensated according to the pay scale for that classification. During their employment as East Precinct desk persons, William Arata and Bernard Schuette were classified as police officers and compensated according to the pay scale for that

classification. [Potter] was compensated at a lower rate of pay that was paid either William Arata or Bernard Schuette.

"* * * * *

"5) At times material herein, virtually all (no less than 95%) of Respondent's police officers were male, and, with one exception in 1974, all of Respondent's PRC II's were female.

"6) The net effect of the circumstances set out in the Findings of Fact above was that [Potter] was discriminated against in terms of her compensation because of her female sex."

As to the law, the Commissioner concluded that the charges made against the City were under the Fair Employment Practices Act rather than the Equal Pay Act and that the City had committed an unlawful employment practice under the Fair Employment Practices Act "by discriminating against [Potter] in compensation because of" her female sex.

The Commissioner ordered the City to pay to Potter a sum of money for back pay plus interest. The City petitioned the Court of Appeals for judicial review of the Commissioner's order.

The Court of Appeals, in banc, reversed the Commissioner on the issue of sexual discrimination in compensation.[1] 61 Or App 182, 656 P2d 353 (1982). The Court of Appeals, in banc, granted reconsideration and modified its original opinion in a manner not pertinent to our review. 64 Or App 341, 668 P2d 433 (1983). Three judges dissented from the majority's reversal of the discrimination determination on grounds that the Commissioner's finding of unlawful discrimination in compensation because of sex was supported by substantial evidence in the record.

As noted at the outset of this opinion, there are two legislative Acts involved in this case. One, the Equal Pay Act, ORS 652.210 to 652.230, is concerned only with the prohibition of discrimination by employers between the sexes in the payment of compensation for labor. The other statute, the

---

[1] Potter had also complained to the Commissioner that the City had unlawfully retaliated against her for her complaints concerning discrimination, and the Commissioner had made an award of damages to Potter on that score. The Court of Appeals affirmed that part of the commissioner's decision, and because the City did not petition this court for review, that aspect of this matter is not before us.

Fair Employment Practices Act, ORS 659.010 to 659.110, makes it unlawful for employers to discriminate against any individual "in compensation" because of the individual's "race, religion, color, sex, national origin, marital status or age," ORS 659.030(1)(b).

At the times with which this case is concerned, the Fair Employment Practices Act, ORS 659.030(1),[2] provided in pertinent part:

"[I]t is an unlawful employment practice:

"(1) For an employer, because of the race, religion, color, sex, or national origin of any individual * * * to discriminate against such individual in compensation * * *."

The Equal Pay Act, ORS 652.220(1), provided:

"No employer shall:

"(a) In any manner discriminate between the sexes in the payment of wages for work of comparable character, the performance of which requires comparable skills.

"(b) Pay wages to any employe at a rate less than that at which he pays wages to his employes of the opposite sex for work of comparable character, the performance of which requires comparable skills."

The Fair Employment Practices Act is the older statute, having its genesis in Oregon Laws 1949, chapter 221, but as originally enacted "sex" was not included in the list above quoted from former ORS 659.030(1). See Or Laws 1949, ch 221, § 5. Discrimination because of sex was addressed by the legislature in 1955,[3] when the Equal Pay Act was passed, Or Laws 1955, ch 193, abolishing discriminatory wage rates based on sex without reference to any other bases for discriminatory practices.

Thus, prior to 1969 the more general statute, the Fair

---

[2] The comparable provision, the same for purposes of this case, is now ORS 659.030(1)(b).

[3] In 1947 the legislature declared it to be against the policy of the State of Oregon for the state and its political subdivisions to discriminate with respect to terms of employment against any individual because of the individual's "race, color, religion, sex, union membership, national origin or ancestry," Or Laws 1947, ch 508, § 2, but that statute was repealed by the Fair Employment Practices Act of 1949, Or Laws 1949, ch 221, § 14, and we are not advised as to the legislature's reason for not including "sex" in the 1949 Act.

Employment Practices Act, prohibited discrimination in employment compensation by reason of a list of factors not including sex, and the Equal Pay Act prohibited such discrimination only on the basis of sex.

In 1969 the legislature amended the Fair Employment Practices Act to include sex as a prohibited factor in fixing compensation.[4] The vehicle for that amendment was HB 1297, of which the chief sponsors were Representatives Connie McCready and Robert Davis. As introduced, the bill's chief purpose was to expand the class of employers to whom the bill would apply. The bill was referred to the House Committee on Labor and Management. At a committee meeting on March 12, Representative Davis explained the bill in terms of its chief purpose. He told the committee that the state law and the bill did not need to address discrimination on the basis of sex "because that is taken care of in the federal law." On March 19 the other chief sponsor, Representative McCready, testified in favor of the bill without mentioning anything about sex.

At a work session on the bill held on March 24, the minutes reflect:

> "Rep. Skelton made the motion to adopt additional amendments to HB 1297. Starting on page 4, line 2, after 'color' insert ', sex' and insert in all places where 'race, religion, color or national origin' appears in the bill. Rep. Skelton explained that there is the question about the fact that discrimination does exist in hiring and employment in practically every field that women enter there is discrimination."

The motion to amend carried. As amended, the bill passed the House. On the Senate side the bill was referred to the Committee on Labor and Industries, where a letter was received from the Oregon State Employees Association, pointing out that the House had failed to add the word "sex" to the list in several places in the Fair Employment Practices Act. The Senate committee amended the bill to correct the omissions; the Senate passed the bill; and the House thereafter concurred in the amendments and repassed the bill.

---

[4] The prohibition was not absolute, but the exception is not pertinent to the case before us.

At no time, insofar as the minutes of both committees reflect, did anyone mention the existence of the Equal Pay Act. It would appear that members of the legislature, as well as the witnesses for and against the bill in committee, overlooked the fact that there was already a statute directly pertaining to discrimination in pay based upon gender.

The co-existence of the two Acts gives rise to the City's contention that a complaint of discrimination in compensation on account of sex will not lie against the City. The Equal Pay Act excludes from the definition of "employer" to whom the Act is applicable

> "the state, or any municipal corporation or political subdivision of the state having in force a civil service system based on merit, or the Federal Government."

ORS 652.210(1). The City asserts that it has a civil service system based on merit.

On the other hand, the definition of "employer" in the Fair Employment Practices Act

> "means any person, including state agencies, political subdivisions and municipalities, who in this state * * * engages or utilizes the personal service of one or more employes * * *."

ORS 659.010(6).

The City argues that since any violation of the Equal Pay Act would be a violation of the Fair Employment Practices Act, the statutes must be construed to exempt the City from this charge of discrimination, or the exemption in the Equal Pay Act will be rendered meaningless.

The Commissioner resolved this contretemps by holding that the 1969 amendment adding "sex" to the list in the Fair Employment Practices Act implicitly repealed the City's former immunity under the Equal Pay Act.

The Court of Appeals' resolution was on a different basis. The court found that there were significant remedies available under one Act that were not available under the other. That being so, the City would have immunity from the "broader" remedies available to an employe under the Equal Pay Act, even though its immunity under the Fair Employment Practices Act might be the same as other employers with respect to remedies available under that Act.

In the end, the Court of Appeals held that there was no evidence to support the Commissioner's finding that the difference in pay to Potter was because of her sex. The Court of Appeals found no direct evidence in the record that the difference in pay was because of Potter's sex; that the City came forward with a "non-discriminatory explanation for the pay disparity, *i.e.,* its civil service classification system"; and that the City's explanation was unrebutted by the claimant, Potter.

■　　　We allowed review primarily to address the issue of burden of persuasion in this kind of case. Before proceeding to that matter, however, we shall touch upon the tension between the Equal Pay Act and the Fair Employment Practices Act.

In 1903 the charter of the City was amended to provide a civil service system that was designed to operate "on the basis of merit." *See* our discussion of the system in *Portland Police Ass'n v. Civil Service Board,* 292 Or 433, 639 P2d 619 (1982). It appears to be most reasonable that when the legislature enacted the Equal Pay Act, it was just such a system that the legislature had in mind in determining a standard for excluding an employer from the reach of the Equal Pay Act. We believe the City is simply not an "employer" under the Equal Pay Act, and if a remedy available under that Act, but not under the Fair Employment Practices Act, were sought by an employe, the City could assert its immunity, and its claim that the Commissioner had "no jurisdiction" would be sound.

Such is not the situation here. The claim is made, and the Commissioner has charged, a discriminatory practice under the Fair Employment Practices Act. It matters not that the words of the charge are substantially in the text of the Equal Pay Act; those words are also a charge of forbidden discrimination in compensation under the Fair Employment Practices Act.

The City contends that this construction of the statutes would remove a defense it would otherwise have under the Equal Pay Act to a claim of disparate pay based upon gender. The City points to the defense available under ORS 652.220(2)(a), which is:

"Payment is made pursuant to a seniority or merit system which does not discriminate on the basis of sex."

That is a defense that is not available to the City by the very text of the Equal Pay Act. That defense is available only to an "employer" under the Equal Pay Act. The City is specifically excluded from being an "employer" under that Act. Our construction of the statutes does not remove the defense; it was never available to the City.

We come now to the matter of the allocation of the burden of persuasion. The Bureau and Potter both acknowledge that the claimant has the burden of persuasion to establish the charge of prohibited discrimination.

The City acknowledges that a "prima facie" case of discrimination was established. In its response to the petitions for review, the City stated:

"The City never contended that the Bureau failed to establish a prima facie case of discrimination.

"* * * * *

"* * * The Bureau showed, through Potter's direct examination, that she was paid at a lower rate of compensation than that paid two male desk officers, although their work was substantially equal. That alone was not direct evidence that Potter was paid less compensation because she is a female, but it did permit such an inference. * * *"

The City's legal stance is somewhat ambiguous. It treats a prima facie case as having the same effect on the allocation of the burden of persuasion as if Potter and the Bureau were entitled, by proof of the predicate fact of disparate pay for equal work, to a presumption that Potter was paid less because she was a female. This appears from the City's response to the petitions for review as follows:

"After the direct testimony of Potter, the city had no doubt that the Bureau had presented a prima facie case of discrimination and that it, the City, then had the burden of proving its affirmative defenses, that is, legitimate nondiscriminatory reasons for the differences in pay."

Despite the City's position that it could overcome the permissible inference only by establishing an affirmative defense, we note that is not necessarily the correct position.

One who merely establishes a *prima facie* case and

rests does not necessarily win even if the opponent adduces no evidence whatsoever and merely relies on a denial of alleged wrongdoing. The trier of fact may, in such instance, decline to draw the permissible inference necessary to establish liability. Indeed, the trier of fact may disbelieve the evidence adduced to establish the fact from which the inferred fact is to be drawn. In either case, the party with the burden of persuasion would lose. On the other hand, were the trier of fact to believe the evidence adduced to prove the primary fact and then draw a permissible inference that establishes the charge, an employer who rests without adducing evidence will lose.[5]

We address the matter as it has been presented to us. The Commissioner did draw the permissible inference that Potter was paid less because of her sex than were the police officers who were performing substantially the same work. We proceed to examine the City's affirmative defenses.

It will be recalled that the first was that of inconsistency between the Equal Pay Act and the Fair Employment Practices Act and want of jurisdiction arising from the City's exclusion as an employer under the former. We have already disposed of that defense.

The second was that the facts alleged were not a violation of the Fair Employment Practices Act because the charges were framed in text very similar to the words employed in the Equal Pay Act. We have already disposed of that defense.

The fifth was that under the City's charter the Civil Service Board was an independent body not subject to control by the City Council and that the employes were compensated according to the system established by the Civil Service Board that the Council had no power to override. The fallacy in that defense is that it assumes the employer in this case is the City

---

[5] To defeat a charge, proof of which depends on the drawing of an inference, one resisting a claim does not necessarily have to establish an "affirmative defense." Under a general denial, it may be shown that the inferred fact does not exist. Ordinarily, whether a fact is to be inferred from one or more other facts is a question to be decided by the trier of fact. This court has held, however, that if on all of the evidence in the case there can be no reasonable doubt of the nonexistence of the fact which can only be inferred, the party depending for success on the inference will lose as a matter of law. *Judson v. Bee Hive Auto Service Co.,* 136 Or 1, 294 P 588, 297 P 1050, 74 ALR 944 (1931).

Council; it is not. The City of Portland is the employer. The voters of that City so wrote their charter as to divide responsibility in employment matters, but it is the City, whether it acts through the Council or the Board, that is a party to this proceeding. If there is unlawful discrimination, *de jure* or *de facto*, for whatever reason, the City cannot avoid responsibility by choosing to wear one hat rather than another.

The third and fourth affirmative defenses overlap. The City alleges that it has a civil service system based on merit, that under that system Potter was in one classification and the male employes in another classification and that the disparity in pay resulted only from the fact that the employes held different positions in different classifications.

■ The City adduced evidence that supported both of those allegations. The City's position seems to be that the Commissioner was bound to accept that evidence as being true because it was unrebutted.[6] The City reasons that since it introduced evidence to sustain those allegations, the burden of persuasion then shifted to Potter and the Bureau thereafter to come forward with evidence to overcome the City's evidence. That argument confuses chronology with substance.

■ As a matter of procedure, such an affirmative defense could be overcome in either of at least three ways. (1) The Commissioner might not be persuaded of the truth of the evidence offered in support of the defense. (2) The Commissioner might be persuaded by the truth of evidence offered by the claimant or the Bureau after the evidence adduced by the City. (3) The Commissioner, *on the basis of all of the evidence received* during the hearing, irrespective of the chronological order in which it was received, might find that despite the establishment of the fact that the City had a civil service system based on merit and that payment had been made pursuant to the respective employes' classifications, there was discrimination by reason of sex.

We are satisfied from the record in this case that the Commissioner found the defense to have been overcome in the

---

[6] Where the credibility of witnesses is concerned, the trier of fact is not necessarily bound by uncontradicted testimony, for the trier of fact may simply not believe the witnesses. *Cf W.R. Chamberlin & Co. v. Northwestern Agencies,* 289 Or 201, 611 P2d 652 (1980).

third way. The Commissioner explained her rationale for concluding that the City had failed to establish a valid affirmative defense:

> "This matter does not turn on how the comparators were classified, but on how they were actually utilized. It involves a utilization situation which is becoming increasingly familiar in compensation cases based on gender. The male comparators worked a position which under- or mis-utilized persons of their classification, often because they were near retirement or disabled. The female comparator worked the same position, but it involved work which appears to have been beyond her clerical classification. She was over-utilized for her classification. Although the comparators were compensated according to their respective classifications, they did not work according to those classification[s]. Their actual work was substantially equal."

Prior to 1973 a female could not have been compensated at the civil service classification for doing this work because she could not be a police officer under that system. After females became eligible to be police officers, the City elected to have the work done by persons from different classifications under the civil service system when, in fact, the "over-utilized" person was drawn from a pool of whom 96 percent were female and the "under- or mis-utilized person" was drawn from a pool of whom 95 percent were men. Such evidence (actually conceded fact) afforded a rational basis for the Commissioner's finding of disparity of pay by reason of sex. The Commissioner found from evidence in the record that the actual position worked by Potter on the one hand and a police officer on the other determined the work to be done by each. Classification under the civil service system did not determine what work was performed by each employe.

In essence, the Commissioner found from conceded fact or substantial evidence in the record that the position worked by both Potter and the respective police officers had two separate rates of pay, actually based on gender.

This matter is before the court for judicial review under ORS 183.480 to 183.497. In reviewing the Commissioner's finding of fact, the court can set the finding of fact aside only if it is not supported by substantial evidence in the record. ORS 183.482(8)(c).

118

■ Evidence includes inferences.[7] The City concedes that the Commissioner on the basis of the evidence before the Commissioner, prior to the introduction of the City's evidence in support of its affirmative defenses, could infer that the City had discriminated against claimant "because she is a female." A *prima facie* case resting on the inference obviously drawn by the Commissioner was conceded by the City to have been established. That *prima facie* case could be defeated as a matter of law by rebuttal evidence, but only if no reasonable person could believe the inferred fact to be true on the evidence presented.

An appropriate analogue is presented by the case of *Judson v. Bee Hive Auto Service Co.,* 136 Or 1, 294 P 588, 297 P 1050, 74 ALR 944 (1931). In that case plaintiff brought action against the owner of a motor vehicle for injuries sustained by plaintiff in a collision with that vehicle while it was being driven by someone who was not the owner. Plaintiff predicated defendant's liability on the doctrine of respondeat superior, showing agency only by ownership. Defendant adduced uncontradicted evidence, including a written lease of the vehicle, to show that the driver had possession and

---

[7] Where judicial affirmance of agency action rests upon identification of a permissible inference, we have noted a "two stage" process:

"An inference has two parts: a primary fact plus a deduction. The evidence directly establishes only the truth of the primary fact or facts from which an inference may be derived therefrom. Rational bases may exist for more than one inference to be drawn from the same primary fact, and the factfinder (*i.e.,* the agency) has the task to decide which one to draw. The court does not substitute its judgment as to which inference should be drawn, but it must review for the existence of a rationale. The rationale is reviewed for soundness, not for conformity to judicial preference. Judicial review of an inference is thus in two stages: (1) whether the basic fact or facts are supported by substantial evidence, and (2) whether there is a basis in reason connecting the inference to the facts from which it is derived. It is a twofold review for substantial evidence and, in a sense, for 'substantial reason,' * * *."

*City of Roseburg v. Roseburg City Firefighters,* 292 Or 266, 271, 639 P2d 90, 93 (1981). That there was substantial evidence for the "basic" facts found by the Commissioner cannot be gainsaid. The question then becomes whether there was a "basis in reason" connecting the Commissioner's inference that claimant was paid less because she was a female to those basic facts. As we have pointed out above, the City has expressly acknowledged that the inference was a permissible one. Necessarily inherent in that acknowledgment is the concession that there was a "rational" basis or bases for the inference. We do not accept the dissent's position that the evidence adduced by the City, as a matter of law, vitiated the inference. To put it another way, we believe that reasonable minds could still differ, on all the evidence, as to whether the inferred fact existed.

operation of the vehicle only as bailee under a bailment of hire, in which business the defendant was engaged. Defendant presented further evidence that the driver of the vehicle owned by defendant was on his own business and not on any business or errand of defendant. Plaintiff had verdict and judgment after denial of defendant's motion for directed verdict on the ground of want of agency. This court held that under existing caselaw the fact of ownership of the vehicle would support an inference that the vehicle was driven on the owner's business, and that the plaintiff by proof of that ownership established a *prima facie* case sufficient to prevail over a motion for nonsuit. This court further held that the evidence to rebut agency was such that but one reasonable deduction could be drawn, namely, that the driver was not operating the vehicle as agent of defendant owner; therefore, defendant's motion for directed verdict should have been allowed.

On judicial review under ORS 183.482(8)(c), a court can reverse the Commissioner only if the only reasonable deduction to be drawn from the evidence as a whole, including that presented by the City, is that the disparity in pay was other than "because of" Potter's female sex. To put it another way, if a reasonable person on the evidence in the record could draw the inference that the acknowledged disparity arose from compensating the female employe at a lower rate than the male employe "because she is a female," the Commissioner's decision on the facts must prevail, no matter what the court might believe from the evidence.

The Court of Appeals' decision on damages for retaliation is affirmed. The Court of Appeals' decision on back pay is reversed and that of the Commissioner is affirmed.

**PETERSON, C. J.,** dissenting.

I would affirm the Court of Appeals.

ORS 659.060(1) requires that the complaint filed by the Commissioner of Labor set forth the "specific charges" which the employer is required to answer. In this case, the complaint filed by the Commissioner of Labor contained this allegation:

"During the period from on or about July 15, 1971 to on or about December 23, 1976, the Complainant, a female person,

performed equal work or work of a character comparable to the work performed by two male employes of Respondent, Police Officers Arata and Schuette, which work was performed under similar working conditions and required equal effort, skill and responsibility. However, the Respondent, because of the Complainant's female sex, compensated the Complainant at a rate lower than that paid to Police Officers Arata and Schuette. * * *"

As the majority points out, the facts are without substantial dispute. Potter was a PRC-II. According to the findings of the Commissioner of Labor, the Bureau of Police decided to staff East Precinct desk positions with one police officer and one PRC-II, rather than two police officers. This decision was based primarily upon "budgetary considerations."

Most of the time, the police officer assigned to desk duty was a male. Some of the time, the police officer assigned to desk duty was a female. In some of the other precincts, all of the desk positions were filled with PRC-IIs.

The Commissioner found that Potter, a female, performed the same duties as did the police officers assigned to desk duty, at a lesser pay. She also found:

"Male persons were allowed to apply for appointment to Respondent's PRC-II classification at all times material herein. Female persons were allowed to apply for appointment to Respondent's police officer classification as of 1973.

"In October, 1974, 492 of Respondent's 508 police officers, or 97%, were male. In July, 1975, 480 of Respondent's 497 police officers, or 97%, were male. In July, 1976, 450 of Respondent's 474 police officers, or 95%, were male.

"In July, 1974, one of Respondent's PRC-II's or 4%, was male. In July, 1975, none of Respondent's PRC-II's were male. In July, 1976, none of Respondent's PRC-II's were male."

The Commissioner also entered this finding:

"The net effect of the circumstances set out in the Findings of Fact above was that Complainant was discriminated against in terms of her compensation because of her female sex.

The Commissioner found a violation of ORS 659.030(1)(a)

(now ORS 659.030(1)(b), as amended), which prohibits discrimination in compensation "because of the * * * sex * * * of any individual."

I agree with the analysis of the Court of Appeals. Its opinion states:

"We find a complete absence of evidence in the record to support a finding that the city in any way brought about the *de facto* segregation by sex that existed and thus was, in the Commissioner's words, 'maintaining two sex-segregated job classifications.' There is only the conclusory statement in the Commissioner's 'Ultimate Findings of Fact' that '[t]he net effect of the circumstances set out in the Findings of Fact above was that claimant was discriminated against in terms of her compensation because of her female sex.' Nothing in the record indicates that the city was any more responsible for the fact that, by and large, police officers were male and PRC-IIs were female than other possible explanations, *e.g.*, the sex of applicants. Furthermore, nothing shows that the city engaged in discriminatory hiring when it filled PRC II positions, and the Commissioner made no such finding.

"The only other way that the city might have discriminated against claimant because of her sex would be if its decision to replace police officers with civilians was made not as an economy measure, but because the civilians were females. Nothing in the record or the Commissioner's order indicates that such was the case, nor does anything indicate that any of the city officials who made the decision to replace officers with civilian employees were even aware that most PRC IIs were female. The Commissioner's 'Conclusion of Law' on the issue was:

" '6) Respondent committed an unlawful employment practice in violation of ORS 659.030(1)(a) by discriminating against Complainant in compensation because of Complainant's female sex in the following particular:

" 'From July 15, 1971 to December 23, 1976, Respondent compensated Complainant at a rate lower than that paid its male employees Arata or Schuette even though Complainant performed substantially equal work, requiring substantially equal skill, effort and responsibility, under similar working conditions, to the work performed by Officers Arata and Schuette.'

"The Commissioner argues that the city failed 'to establish that the city's "merit system" was anything other than a pretext for discriminatory pay practices.' The claimant bore

the burden of proof on that issue. There is no evidence that the use by the city of a job classification to accomplish its aims was a pretext for job discrimination based on sex.

"Employment discrimination is rarely susceptible of direct proof, and proof of discrimination frequently depends on inferences drawn by the finder of fact from other evidence. Here, claimant produced no direct evidence of discrimination, and the city came forward with a non-discriminatory explanation for the pay disparity, *i.e.,* its civil service classification system. The Commissioner has failed to make explicit her theory of discrimination. Finding a complete absence of evidence to support a finding that the city discriminated against claimant *'because of'* her sex in violation of former ORS 659.030(1)(a), we reverse that portion of the Commissioner's order that awarded damages for the pay disparity." *City of Portland v. Bureau of Labor and Ind.,* 61 Or App 182, 188, 656 P2d 353 (1982). (Emphasis in original.)

In its petition for review, the Department of Labor correctly states:

"There is no question in this case that claimant was discriminated against in compensation. The only issue is whether the discrimination was 'because of sex' within the meaning of ORS 659.030(1)(a) * * *."

I agree that Potter did not receive equal pay for equal work. She was discriminated against. But that does not prove discrimination "because of an individual's * * * sex." ORS 659.030(1).

The city has established that the assignment of Potter to this job was because of her classification as a PRC-II, not because of her sex. The Department's and Potter's rejoinder is that the city's proof falls short because women occupied virtually all PRC-II positions and men occupied virtually all police officer positions.

There is no evidence that the city had a motive for discriminating against Potter as an individual, or because Potter was a woman. Her claims are based upon a "disparate impact" theory of recovery which, if even pleaded, has not been established. In this type of case, an employee must show that a facially neutral employment practice has a significantly discriminatory impact upon one protected by ORS 659.030. *Compare Connecticut v. Teal,* 457 US 440, 446, 102 S Ct 2525,

2531, 73 L Ed 2d 130, 137 (1982); *Moore v. Hughes Helicopters, Inc.*, 708 F2d 475, 481 (9th Cir 1983).

There is no evidence that the city paid Potter less than her coworkers because Potter was a woman. The only evidence to support Potter's allegation that she was paid less because of her "female sex" (to use her words), is that *any* female PRC-II who performed this work would be discriminated against because 95 percent of the PRC-IIs were female while the police officers permanently assigned to the other desk were male. As the majority states and the Commissioner of Labor found, the decision to employ PRC-IIs was made to save money. If 50 percent of all PRC-IIs were men and all PRC-IIs were selected under facially neutral employment practices, it is clear that, under the facts of this case, *Potter* would not have been discriminated against because of her sex.

Beyond question, Potter (and any other PRC-II, male or female, who worked as a precinct desk clerk) did not receive equal pay for equal work. The essence of Potter's theory of recovery, though pleaded as a claim of "disparate treatment,"[1] is a claim based upon a disparate impact theory. Her theory (and the theory upon which the Commissioner of Labor granted recovery for the earnings differential) is that the facially neutral employment practice — using PRC-IIs as desk clerks — had a significant discriminatory impact upon a protected group — women — because 95 percent of the PRC-IIs were women.

---

[1]

"* * * The ususal disparate treatment case is an individual case, and the focus of the contest is on the employer's motivation for the different action taken, with the plaintiff attempting to prove intentional bias and the employer contending that its actions were based on a legitimate, nondiscriminatory reason. In evaluating this issue, the Supreme Court requires a tripartite order and allocation of proof. The plaintiff must establish a prima facie case; the employer must then come forward with evidence of a legitimate, nondiscriminatory reason for its actions; and the plaintiff must then prove that this supposed legitimate, nondiscriminatory reason is in fact a pretext for intentional discrimination, with the burden of proof remaining at all times with the plaintiff.

"In contrast to the disparate treatment theory, proof of discrimination under the adverse impact theory focuses upon the effects of the alleged discriminatory practice. The consequences of employment policies rather than the employer's motivation or intent is of paramount concern. The essence of the adverse impact theory is a showing that a policy or practice has a substantial adverse impact on a protected group, notwithstanding its equal application to all individuals. * * *" B. Schlei and P. Grossman, Employment Discrimination Law 1286 (2d ed 1983). (Footnotes omitted.)

The disparate impact theory, commonly invoked in hiring and promotion discrimination cases (as distinct from wage discrimination cases), does not require a showing of a specific discriminatory intent against an individual if the employer's procedures operate against protected groups as "built-in headwinds." *Griggs v. Duke Power Co.,* 401 US 424, 432, 91 S Ct 849, 854, 28 L Ed 2d 158, 165 (1971). Disparate *treatment* cases focus on whether the individual or group has been subjected to intentional unlawful discrimination; disparate *impact* cases focus on whether facially neutral practices disproportionately affect members of a protected group. As stated, Potter's claim for the wage differential was pleaded as and based upon a theory of intentional discrimination. In reality, her recovery is based upon a theory of unintentional discrimination (disparate impact).

In employment and promotion cases, the analysis relied upon by the Commissioner and the majority is common. For example, if it is shown that the pool from which new employees are drawn is 50 percent black and 50 percent white, hiring only blacks or only whites might establish a claim of disparate impact discrimination in hiring.[2]

Similarly, a 95/5 percent ratio between female and male PRC-IIs might be sufficient to establish an eligible male's claim of discrimination in hiring if it were shown that the pool of eligible persons from which to draw were 50/50

---

[2]

"* * * But in advancing this commendable objective, Title VII jurisprudence has recognized two distinct methods of proof. In one set of cases — those involving direct proof of discriminatory intent — the plaintiff seeks to establish direct, intentional discrimination against him. In that type of case, the individual is at the forefront throughout the entire presentation of evidence. In disparate-impact cases, by contrast, the plaintiff seeks to carry his burden of proof by way of *inference* — by showing that an employer's selection process results in the rejection of a disproportionate number of members of a protected group to which he belongs. From such a showing a fair inference then may be drawn that the rejected applicant, as a member of that disproportionately excluded group, was himself a victim of that process' ' "built-in headwinds." ' Griggs, supra, at 432, 28 L Ed 2d 158, 91 S Ct 849. But this method of proof — which actually *defines* disparate-impact theory under Title VII — invites the plaintiff to prove discrimination by reference to the group rather than to the allegedly affected individual. There can be no violation of Title VII on the basis of disparate impact in the absence of disparate impact on a *group*." *Connecticut v. Teal,* 457 US 440, 458, 102 S Ct 2525, 2537, 73 L Ed 2d 130, 144 (1982) (Powell, J., dissenting.) (Emphasis in original; footnotes omitted.)

male and female. But I cannot see why a claim of discrimination against Potter is made out in this case because she is female and 95 percent of PRC-IIs are female.

I confess to some difficulty in applying the disparate impact analysis in a case of alleged discrimination in wages (as compared with hiring and promotion cases). But that is what the majority and the Commissioner have done. Even if women comprised only five percent of the PRC-IIs, the evidence would still establish that Potter did not receive equal pay for equal work. But that would not make out a claim of sex discrimination.

On the reasoning adopted by the majority, whenever an employer draws employees from separate employee classifications to perform duties common to both classifications at different salaries, and the raw statistical profiles of those classifications indicate that members of a protected class are "over-represented" in one class and "under-represented" in the other in relation to the general population, the specter of employment discrimination has attached. This result will obtain regardless of the validity of the eligibility and selection process for each classification and regardless of the validity of the decision to have overlapping job functions between the classifications.

Without a more complete statistical analysis of the qualified applicant pool and eligibility requirements for each classification — more than exists in this case — a claim of disparate impact discrimination cannot be made out. To acknowledge, without more, that such tenuous and potentially misleading data is sufficient to find the city's civil service classification system is a mere pretext for unlawful discrimination is not reasonable or necessary.

In short: Courts determine whether inferences *can* be drawn; triers of fact determine which permissible inference *will* be drawn. Although there is ample evidence that the city discriminated against Potter, unlike the majority, I see no facts from which an inference can be drawn that the city discriminated against Potter because she was a woman. There is no evidence of disparate *treatment* of Potter by the city. Nor

is there sufficient evidence to establish a wage discrimination claim based upon a disparate impact theory.[3]

.

---

[3]The Commissioner's regulations, adopted since this case was tried, suggest this conclusion. Her regulations distinguish between "intentional unlawful discrimination" (disparate treatment, OAR 839-05-010) and "unintentional discrimination" (disparate impact, OAR 839-05-020).