840 F.2d 1409
 54 Fair Empl.Prac.Cas. 1873,
45 Empl. Prac. Dec. P 37,758,
46 Empl. Prac. Dec. P 37,996
 Stephanie E. FORSBERG, individually and on behalf of all
other similarly situated persons, Plaintiff-Appellant, and
Carol Ann Bastiani; Linda Beaty; Barbara Berberick, et
al., Applicants in Intervention-Appellants,
v.
PACIFIC NORTHWEST BELL TELEPHONE COMPANY, Defendant-Appellee,
v.
COMMUNICATIONS WORKERS OF AMERICA, LOCAL 9201, Non-Aligned
Party-Appellant, and Communication Workers of America
(International); Communication Workers of America, Local
9204; Communication Workers of America, Local 9206;
Communication Workers of America, Local 9208, Non-Aligned Parties.
Stephanie E. FORSBERG, individually and on behalf of all
other similarly situated persons, Plaintiff-Appellee,
v.
PACIFIC NORTHWEST BELL TELEPHONE COMPANY, Defendant-Appellant,
and
Communications Workers of America (International);
Communications Workers of America, Local 9201;
Communication Workers of America, Local 9204; Communication
Workers of America, Local 9206; Communication Workers of
America, Local 9208, Non-Aligned Parties-Appellees.
Stephanie E. FORSBERG, individually and on behalf of all
other similarly situated persons, Plaintiff-Appellee,
v.
PACIFIC NORTHWEST BELL TELEPHONE COMPANY, Defendant-Appellant,
Communication Workers of America, Local 9201, Non-Aligned
Party-Appellee,
and
Communication Workers of America (International);
Communication Workers of America, Local 9204;
Communications Workers of America, Local 9206;
Communication Workers of America, Local 9208, Non-Aligned Parties.
 
 Nos. 86-4054, 86-4144 and 87-3536.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Sept. 11, 1987.
Decided Feb. 8, 1988.
As Amended May 27, 1988.
 David H. Wilson, Jr., Bullard, Korshoj, Smith & Jernstedt, P.C., Portland, Or., for defendants-appellees.
 Stephen H. Buckley, Carney, Buckley, Kasameyer & Hays, Portland, Or., for nonaligned parties.
 Appeal from the United States District Court for the District of Oregon.
 Before WRIGHT, WALLACE and PREGERSON, Circuit Judges.
 WALLACE, Circuit Judge:
 
 
 1
 Stephanie Forsberg, on behalf of all similarly situated past, present, and future females employed as "Maintenance Administrators" (MAs) by Pacific Northwest Bell Telephone Company (the company) since March 7, 1983, appeals the district court's orders denying class certification and granting summary judgment to the company on a variety of state and federal sex discrimination claims. Forsberg sought monetary and injunctive relief. The district court had jurisdiction pursuant to 28 U.S.C. Sec. 1331, 29 U.S.C. Sec. 216(b), and 42 U.S.C. Sec. 2000e-5(f)(3) on the federal claims and exercised pendent jurisdiction over one of the state claims. We have jurisdiction pursuant to 28 U.S.C. Sec. 1291. We affirm.
 
 
 2
 * In 1979, the company employed both men and women as test desk technicians (TDTs). The majority of TDTs were men. The TDTs used a manual testing device located on a testboard in order to diagnose malfunctions in customer telephone lines. A TDT would receive a "trouble ticket" containing a clerk's description of a customer's complaint. The TDT would then perform a series of manual tests on the testboard, which contained a complex panel of switches and keys. The TDT would use these switches and keys to diagnose a malfunction. The TDT would then analyze the results and dispatch a crew to solve the problem. TDTs performed this function in forty-one different repair service bureaus throughout the Northwest. The collective bargaining agreement, which the American Telephone and Telegraph Company (AT & T) and the Communication Workers of America (union) negotiated, classified the TDT position as a "craft" level position.
 
 
 3
 In 1980, AT & T (then the parent telephone company) introduced a computerized testing device known as MLT-1 (mechanized loop testing). The MLT system uses computer terminals and keyboards, instead of a manually operated testboard, to analyze customer complaints about malfunctioning telephone lines. In light of the MLT-1 system, AT & T and the union entered collective bargaining negotiations in 1980 and created the MA position. The negotiating parties did not classify the MAs as "craft" level employees. Instead, they agreed that they would classify the MAs as G-5 clerks, but would pay the MAs at the G-8 rate. In order gradually to fill the MA positions over the ensuing two years, the company promoted clerks who the company would have otherwise terminated. Most of these clerks were women who previously performed manual record keeping functions. Although some TDTs continued to function, the MAs who used the MLT-1 system performed about seventy-five percent of the work that TDTs formerly performed and nearly all of the manual record keeping that the MAs had formerly performed as clerks.
 
 
 4
 In 1982, AT & T introduced MLT-2, an improved MLT system. The company retrained the MAs who had been operating the MLT-1 system. By January 1983, these retrained MAs were using the MLT-2 system to perform all of the testing that the TDTs formerly performed manually. As a result, the company phased out the TDT position. In addition, by introducing the MLT-2 system, the company centralized the testing facilities into fifteen maintenance centers, rather than operating forty-one repair service bureaus which it had when it used TDTs to diagnose telephone line malfunctions.
 
 
 5
 Under the MLT-2 system, an MA uses a computerized testing device consisting of a keyboard and a computer screen. Unlike the TDT, the MA does not receive a narrative slip with a customer complaint and then conduct a series of tests to identify the malfunction. Instead, when the company receives a complaint, a message clerk enters the customer's complaint into the MLT-2 system. The MLT-2 then automatically conducts a series of tests on the customer's telephone lines. The MLT-2 then electronically produces a report that identifies the problem and suggests a solution. It is through this report that an MA first learns that a customer is having trouble with his or her telephone line. The MA then analyzes the report and assesses the MLT-2's recommendation.
 
 
 6
 In some cases, the MA must use the MLT-2 to perform additional verification tests. This is done by "telling" the MLT-2 to conduct certain tests by entering certain simple keystrokes. For example, to determine whether there is a foreign current on a certain line, an MA types the customer's telephone number into the computer and presses "F." The MA then presses the send/receive button on the keyboard. Within one minute, the MLT-2 completes the appropriate test and the results appear on the screen. The MLT-2 provides a diagnosed solution. The MA then relays the diagnosis to a technician to cure the problem.
 
 
 7
 In 1983, AT & T and the union negotiated another collective bargaining agreement. The 1983 agreement retained the MA job classification and title and continued the G-8 pay rate.
 
 
 8
 The company has employed Forsberg as an MA at least since March 7, 1983. On November 16, 1984, Forsberg sued the company, on behalf of all similarly situated past, present, and future females that the company has employed as MAs since March 7, 1983. Forsberg's complaint alleged that wages were low because the company discriminated against women in violation of Title VII of the Civil Rights Act, 42 U.S.C. Sec. 2000e (Title VII), the federal Equal Pay Act (EPA), 29 U.S.C. Sec. 206, the Oregon Fair Employment Practices Act (Oregon FEPA), Or.Rev.Stat. Sec. 659.030, the Oregon Equal Pay Act, Or.Rev.Stat. Sec. 652.220, and the Oregon Wage Claim Statute, Or.Rev.Stat. Sec. 652.355. She claimed that: (1) there was substantial disparity in pay rates between the MAs, a predominantly female group, and the former TDTs, a predominantly male group, and (2) the work done by the MAs and TDTs was "substantially equal." Forsberg, the purported class, and approximately 80 federal EPA opt-in plaintiffs sought monetary and injunctive relief.
 
 
 9
 The company moved to join the union and Locals 9201, 9204, 9206, and 9208 of the union as defendants, on the grounds that the union had bargained for and agreed to the wage rates that the MAs alleged to be discriminatory. The company argued that if Forsberg and the class proved the alleged pay discrimination, then the union could be liable for the discrimination. In addition, the company argued that if Forsberg received the relief sought, such relief would necessarily affect the terms of the union contract. Finally, the company maintained that the district court should decline to assert pendent jurisdiction over Forsberg's state law claims.
 
 
 10
 The district judge joined the union and the union locals as defendants under Fed.R.Civ.P. 19 to establish any potential liability of the union or the union locals, as well as to avoid the possibility that the company would be subject to inconsistent obligations. Forsberg v. Pacific Northwest Bell Telephone Co., 623 F.Supp. 117, 121 (D.Or.1985) (Forsberg ). She also declined to exercise pendent jurisdiction over Forsberg's claims under the Oregon Wage Claim Statute and Oregon Equal Pay Act, but asserted jurisdiction over the claims arising under the Oregon FEPA. Id. at 127-28.
 
 
 11
 Subsequently, the district judge reconsidered her earlier order and issued a new order that realigned the union and the union locals as non-aligned parties joined solely for the limited purposes of ensuring (1) that any relief granted to Forsberg would be binding on the union, and (2) that the company would not be subject to inconsistent obligations based upon any relief the court would grant. Forsberg v. Pacific Northwest Bell Telephone Co., 622 F.Supp. 1147, 1150 (D.Or.1985) (Forsberg ). The district court also assigned Forsberg's motion for class certification to a United States Magistrate. The magistrate recommended certifying the class as to the Title VII and Oregon FEPA claims, but not as to the EPA claims. The district court did not adopt the magistrate's recommendations and denied class certification for all claims.
 
 
 12
 The company then moved for summary judgment on all remaining claims. First, the company claimed that because the "comparator" job of TDT was, at one time, comprised of one-third females, Forsberg could not state a claim under the EPA. Second, the company claimed that the MA job and the TDT job were not "substantially equal" as a matter of law. Third, the company moved to dismiss all EPA opt-in claimants outside of Portland, contending that the Portland maintenance center was a single "establishment" under the EPA. Fourth, the company moved against Forsberg's Title VII equal pay claim and Oregon FEPA claim for the same reason that it opposed the EPA claims. Finally, the company contended that Forsberg presented insufficient evidence of intentional discrimination to withstand the company's summary judgment motion.
 
 
 13
 The district court granted the company's motions on all claims. Forsberg timely appealed. She asks that we reverse the summary judgment and certify the class for all of her claims.
 
 II
 
 14
 In this appeal, we decide whether the district court was correct in granting summary judgment to the company on Forsberg's EPA claim, her Title VII claim, and her Oregon FEPA claim. We review the entry of summary judgment de novo to determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Ashton v. Cory, 780 F.2d 816, 818 (9th Cir.1986). The moving party must produce evidence showing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). On a summary judgment motion, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (Anderson ).
 
 A.
 The EPA provides in part that:
 
 15
 No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex....
 
 
 16
 29 U.S.C. Sec. 206(d)(1) (emphasis added). The EPA is broadly remedial and courts should construe and apply it so as to fulfill the underlying purposes that Congress sought to achieve. Corning Glass Works v. Brennan, 417 U.S. 188, 208, 94 S.Ct. 2223, 2234, 41 L.Ed.2d 1 (1974) (Corning Glass ). The EPA embodies the principle that employees doing equal work should be paid equal wages, regardless of sex. Id. at 195, 94 S.Ct. at 2228.
 
 
 17
 In order to make out a prima facie case under the EPA, a plaintiff bears the burden of establishing that he or she did not receive equal pay for equal work. See Spaulding v. University of Washington, 740 F.2d 686, 696 (9th Cir.) (Spaulding ), cert. denied, 469 U.S. 1036, 105 S.Ct. 511, 83 L.Ed.2d 401 (1984). In broad terms, the EPA defines what constitutes equal work by specifying that jobs are equal if their performance requires "equal skill, effort, and responsibility" and they are performed under "similar working conditions." 29 U.S.C. Sec. 206(d)(1). A plaintiff need only show that "the jobs [being compared] are substantially equal, not necessarily that they are identical." Spaulding, 740 F.2d at 697. In assessing a plaintiff's claim of substantial equality between jobs, a court should rely on actual job performance and content rather than job descriptions, titles, or classifications. Id.; 29 C.F.R. Sec. 1620.13(e) (1987). Courts necessarily must determine the issue of substantial equality on a case-by-case basis. Spaulding, 740 F.2d at 697. The EPA's requirements that the two jobs being compared require substantially equal skill, effort, responsibility, and be performed under similar working conditions are separate tests, each of which must be met in order to state a claim under the EPA. 29 C.F.R. Sec. 1620.14(a) (1987); see Angelo v. Bacharach Instrument Co., 555 F.2d 1164, 1175-76 (3d Cir.1977) (Angelo ) ("We find nothing in the case law or in the legislative history to support the proposition that ... differences in responsibility between two jobs can be offset by competing differences in the skill required so as to make the two jobs equal.").
 
 
 18
 The district court examined the facts in the light most favorable to Forsberg and concluded that there was "an appreciable variation in the level of skill, effort, and responsibility required to perform the two positions in question...." Forsberg argues that the district court erred in reaching this determination. First, Forsberg argues that a factor-by-factor analysis of skill, effort, responsibility, and working conditions demonstrates the existence of a material issue of fact pertaining to whether the MA and TDT jobs are "substantially equal." Second, Forsberg argues that the district court erroneously concluded that the MA and TDT jobs were not "substantially equal" as a matter of law because the MAs and TDTs used different equipment. We address these arguments in turn.
 
 1.
 
 19
 Forsberg contends that the district court failed to analyze each job's skill, effort, responsibility, and working conditions. Forsberg argues that if the district court would have conducted the "proper" analysis of each of these components under the EPA, the district court would not have granted summary judgment on this claim.
 
 
 20
 Regarding equal skill, Forsberg contends that there is a material issue of fact concerning whether the MA and TDT job require "substantially equal" skill. She contends that skill encompasses such factors as education, training, experience, and ability. She then analyzes each of these subfactors, which she asserts constitute "skill" under the EPA.
 
 
 21
 Forsberg argues that there was no evidence before the court on the issue of education. As for training, Forsberg contends that the affidavits show that both TDTs and MAs received extensive formal training, together with on-the-job training. She also argues that a material issue of fact exists concerning the requisite experience, because the company presented an affidavit in which a TDT stated that "craft" skills were directly related to his job as a TDT, but Forsberg presented an affidavit in which a former TDT stated that his prior craft experience did not aid him in his work as a TDT. Finally, regarding the question of ability, Forsberg admits that an MA cannot operate a testboard, but contends that, nonetheless, MAs and TDTs have substantially equal ability. She argues that MAs are merely displaying their ability on more modern equipment than did the TDTs.
 
 
 22
 The company, on the other hand, concludes from its analysis of the factors of education, training, experience, and ability that there is no material issue of fact concerning the skill necessary for the TDT job as compared to the MA job. The company argues that undeniably both jobs require formal classroom training and on-the-job training, but that the training is different. The company contends that the affidavits demonstrate that the prior job-related experience of the TDTs was substantially superior to that of the MAs; the average TDT had over eight years of employment in technical craft positions before becoming a TDT. The company claims that such craft experience was directly relevant to and necessary for performing the TDT job. As for ability, the company points to the numerous affidavits in which MAs admit that they do not know how to use a testboard to diagnose customers' lines for malfunctions.
 
 
 23
 Forsberg cannot succeed on her claim under the EPA if we cannot find a material issue of fact concerning the substantial equality of the skills required for the MA and TDT jobs, as measured by the performance requirements of the two jobs. See 29 C.F.R. Sec. 1620.15(a) (1987). The Department of Labor has suggested that we should consider such factors as education, training, experience, and ability when assessing a claim that two jobs require substantially equal skill. Id.; cf. Corning Glass, 417 U.S. at 202-03, 94 S.Ct. at 2231-32 (analyzing the factors that the Department of Labor stated are encompassed under "working conditions" in the EPA). The Department of Labor's suggested factors concerning equal skill are suggested avenues of inquiry that will help us determine whether the actual job content of the two jobs being compared requires substantially equal skill. See Spaulding, 740 F.2d at 698; Hein v. Oregon College of Education, 718 F.2d 910, 914 (9th Cir.1983) (Hein ) ("jobs requiring different skills are not substantially equal"); Angelo, 555 F.2d at 1175 (equality under the EPA includes job content); 29 C.F.R. Sec. 800.121 (1986) (actual job requirements and performance controls inquiry under the EPA). Thus, even if Forsberg has raised a material issue of fact as to one of the Secretary of Labor's four suggested subfactors of skill, summary judgment would not necessarily be improper if, for example, the consideration of a subfactor, such as ability (as it relates to skill) clearly precludes any issue of material fact. In conducting our analysis, we should focus primarily on the relationship between job content and the requisite skills. See 29 C.F.R. Sec. 800.121 (1986) (look to actual job requirements and performance). This analysis necessarily requires that we examine the types of skills that each job requires.
 
 
 24
 Focusing on the types of skills that each job requires is consistent with Angelo, in which the Third Circuit analyzed an EPA claim in which the plaintiffs alleged that their jobs as Bench Assemblers were substantially equal to Heavy Assemblers. The Bench Assemblers claimed that they performed the same functions including "cutting, wiring, soldering, drilling" as the Heavy Assemblers. Angelo, 555 F.2d at 1171. The court concluded, however, that the two jobs required different types of skills to perform these same functions. Id. at 1172-73. Thus, although performing similar tasks, the plaintiffs presented no evidence showing that the types of skills each worker used were substantially equal under the Act. Id. at 1172. "For example, there was no evidence that the cutting performed by Grade 5 Light Assemblers was as arduous or as delicate as that performed by Grade 3 Heavy Assemblers." Id. Therefore, the court affirmed entry of a directed verdict by the district court.
 
 
 25
 Angelo involved a situation in which men and women were performing superficially similar tasks, such as cutting and drilling. Yet, the Third Circuit astutely observed that tasks that may be similar on the surface may require varying levels of skill on performing them. In the case before us, we are faced with a situation in which two jobs involving superficially similar tasks require qualitatively different skills in their performance. We are also faced with a situation in which the two jobs being compared do not involve even the same physical or mental tasks. Although, both TDTs and MAs performed the same function for the company--identifying the cause of malfunctions on telephone lines--the tasks, much less the underlying skills, were entirely dissimilar. Looking beyond the surface similarities to the underlying skills required in performing the two jobs leaves no doubt that plaintiff's claims of sex-based pay discrimination must fail.
 
 
 26
 The TDT possessed substantially different skills than the MA. The TDT received the "trouble ticket," manually performed a series of tests on the testboard, identified the source of the malfunction by interpreting the results, and determined a solution. By contrast, the MAs receive the customer complaint and a proposed solution on a screen. If additional testing is required, the MA merely enters a few simple keystrokes on the computer terminal, and the computer then automatically runs the tests, identifies the problem, and determines the solution. The MA job simply does not require the analytical, "puzzle-solving" skills that the TDT job required. When MLT-2 was developed, most of the challenging analytical and decisionmaking tasks were transferred from the human operator to the computer. The MAs do not operate a testboard, diagnose a malfunction through a complex series of manual tests, and determine a solution. The type of skills and analytical puzzle-solving ability involved in the MA position are subsequently equal as a matter of law to the skills and analytical puzzle-solving ability required in the former TDT position. See 29 C.F.R. Sec. 1620.15(a) (discussing ability as a subfactor of skill). As in Angelo, the district court properly intervened without jury determination.
 
 
 27
 Because the skills necessary for the two jobs are not substantially equal, we need not analyze whether there is a material issue of fact concerning effort, responsibility, or working conditions. In order to succeed on a claim under the EPA, there must be substantial equality for each component. 29 C.F.R. Sec. 1620.14(a) (1987). We also need not address the company's argument that we should affirm summary judgment on the independent ground that there was no pay discrimination between men and women MAs, nor the company's argument that the Portland Maintenance Center constituted a single "establishment" for purposes of the EPA.
 
 2.
 
 28
 Forsberg also argues that the district court erroneously concluded that the MA and TDT jobs were not "substantially equal" as a matter of law because the MAs and TDTs used different equipment. In making this argument, Forsberg relies on 29 C.F.R. Sec. 800.123 (1986) and Thompson v. Sawyer, 678 F.2d 257 (D.C.Cir.1982) (Thompson ).
 
 29 C.F.R. Sec. 800.123 states in part:
 
 29
 [T]he performance of jobs on different machines or equipment would not necessarily result in a determination that the work so performed is unequal within the meaning of the statute if the equal pay provisions otherwise apply. If the difference in skill or effort required for the operation of such equipment is inconsequential, payment of a higher wage rate to employees of one sex because of a difference in machines or equipment would constitute a prohibited wage rate differential.
 
 
 30
 In Thompson, the D.C. Circuit held that two jobs in a book bindery were "substantially equal" even though the employees performed the two jobs being compared on two different machines. Thompson, 678 F.2d at 273-74, 277. The court expressly rejected the argument that work could not be substantially equal if performed on different machines. Id. at 273.
 
 
 31
 While we agree that two jobs could be substantially equal under the EPA even though performed on different machines, Thompson does not help Forsberg. In Thompson, the court analyzed in detail the types of skills necessary to operate the two machines. The court discussed the following aspects of operating the Smyth sewing machine, which the plaintiffs contended was substantially equal to operating a bookbinder machine:
 
 
 32
 The operator of the Smyth chooses the number of needles required for a particular job and sets thread and bobbin tension for each needle. She also sets the needles to position stitching properly along the spine of the book and sets guides to position signatures as they are sewn together. She is responsible for routine maintenance tasks such as changing needles and oiling and cleaning the machines. In operating the machine, she opens signatures and places them on a "pusher." Because the operator does not control the pace of the pusher, considerable dexterity is required to feed at the proper rate. The Smyth also runs paste along the spine of the book to ensure additional strength; the Smyth operator must coordinate a cutter at the proper moment when the "inside" of a particular book is sewn together.
 
 
 33
 Id. at 274. The court then said that the district court did not err in relying on expert testimony to the effect that operating the Smyth sewing machine and a bookbinder machine involved substantially equal skill, effort, responsibility, and working conditions. Id. at 274. Thus, the court examined the actual job content of operating the Smyth sewing machine and of operating a bookbinder machine in affirming a violation of the EPA.
 
 
 34
 In relying on Thompson, Forsberg ignores a significant aspect of that case. In Thompson the court conducted a second inquiry into the skills required to operate another machine used in the bookbinding process called an oversewer. Following this inquiry into the relationship between skills and job content, the court affirmed another aspect of the district court opinion in which the district court concluded that the Government Printing Office did not violate the EPA when it paid oversewers, who operated different sewing machines, less than bindery workers, who operated the bookbinder machines. The court stated that the machine the oversewer used was "considerably less difficult to operate than the Smyth," and therefore the plaintiffs could not even establish a prima facie case of substantial equality. Id. at 277. The court in Thompson conducted a careful inquiry into the operation of each machine that the plaintiffs wished to compare, and focused on the specific skills required to operate the machines.
 
 
 35
 As in Thompson, where the D.C. Circuit concluded that the machine the oversewer used was 'considerably less difficult to operate' than the bookbinder, we concluded that operating the computer involves considerably less difficult tasks and analytical ability that operating the testboard. Forsberg and the other MAs do not perform complex analytical mental and physical tasks similar to those tasks necessary to operate the testboard and thereby diagnose telephone line malfunctions. Rather, they simply enter a fe simple keystrokes; the computer performs the tests and diagnoses the malfunction.
 
 
 36
 Notwithstanding that the MAs do not possess remotely similar skills and ability, she argues that, as in Thompson, the district court should have allowed a jury to hear her expert witness who was prepared to testify that the MA and TDT jobs were substantially equal for purposes of the EPA. The company argues that the affidavit of Forsberg's expert was not in the summary judgment record before the district court and, therefore, we should not consider it. In the alternative, the company argues that the expert's affidavit does not assist Forsberg since it is based on job descriptions rather than actual job performance and content. Thus, the company argues, the affidavit fails to address the appropriate inquiry under the EPA.
 
 
 37
 Forsberg failed to include her expert's affidavit in the papers presented in opposition to the summary judgment. The affidavit was before the district court for a different reason: the district judge considered and rejected the affidavit when she denied class certification. But our inquiry is based upon what was before the district judge when the summary judgment was decided. The district judge is not required to comb the record to find some reason to deny a motion for summary judgment. If a party wishes the court to consider an affidavit for more than one issue, the party should bring that desire to the attention of the court. Having failed to do so, Forsberg cannot now fault the district judge for failing to consider the affidavit.
 
 B.
 
 38
 Forsberg's Title VII claim is based on two separate theories. Forsberg first argues that the company violated Title VII by failing to provide equal pay for equal work. The district court rejected this contention.
 
 
 39
 Part of Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" or to "limit, segregate, or classify his employees or applicants for employment" on the basis of sex. 42 U.S.C. Sec. 2000e-2(a). Equal pay claims asserted under Title VII must satisfy the same substantial equality test applied to claims asserted under the EPA. Gunther v. County of Washington, 623 F.2d 1303, 1313 (9th Cir.1979), aff'd, 452 U.S. 161, 101 S.Ct. 2242, 68 L.Ed.2d 751 (1981). Forsberg's EPA claim could not survive summary judgment; therefore, her equal pay claim under Title VII also fails.
 
 
 40
 In Forsberg's second theory, she contends that there is a material issue of fact as to whether the company engaged in "intentional discrimination" in violation of Title VII. The Supreme Court, in County of Washington v. Gunther, 452 U.S. 161, 168, 101 S.Ct. 2242, 2247, 68 L.Ed.2d 751 (1981), held that the scope of sex-based discrimination under Title VII is broader than that under the EPA. Forsberg bases her claim of intentional discrimination on (1) a 1973 consent decree entered in the Eastern District of Pennsylvania and dissolved in 1979, prohibiting AT & T from violating the EPA; (2) "the history of the company, and its pattern and practice of discrimination of all kinds"; (3) "the evidence presented to Judge Frye"; and, (4) a 1971 quotation from an Equal Employment Opportunity Commission (EEOC) brief contending that the telephone companies have discriminated against women since 1965. Forsberg did not offer, and the district court did not receive, this brief into evidence. Nor is it in the record in this appeal.
 
 
 41
 The district court rejected Forsberg's contentions. The court concluded that Forsberg's assertion of intentional discrimination was based merely on conclusory allegations.
 
 
 42
 Although neither Forsberg nor the company expressly so states, it is clear that Forsberg bases this Title VII claim on a disparate treatment theory. Under a disparate treatment theory, proof of an employer's intent to discriminate is an essential element of a plaintiff's prima facie case. Spaulding, 740 F.2d at 700. A plaintiff alleging discrimination under a disparate treatment theory cannot merely show that an employer was aware that a given policy would lead to adverse consequences for a given group. AFSCME v. State of Washington, 770 F.2d 1401, 1405 (9th Cir.1985). A plaintiff must show that an employer chose the particular policy because of its effect on members of a protected class. Id.
 
 
 43
 Although it is often difficult to obtain direct proof of discrimination, we can infer the requisite discriminatory intent from circumstantial evidence. See Furnco Construction Corp. v. Waters, 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). Also, in certain cases we can infer intent from statistical evidence. Spaulding, 740 F.2d at 703. Courts, however, should rely on statistics with caution. Id.; see also International Brotherhood of Teamsters v. United States, 431 U.S. 324, 338-40, 97 S.Ct. 1843, 1855-56, 52 L.Ed.2d 396 (1977) (statistics are most helpful when plaintiff supplements them with specific incidents of discrimination). Applying these principles, we must reverse the summary judgment if Forsberg has raised a material issue of fact concerning the company's intent to discriminate against female MAs when it implemented the MLT system.
 
 
 44
 None of the evidence in the record pertaining to the 1980 or 1983 collective bargaining negotiations even hints that the company intended to discriminate. On the contrary, the record shows that AT & T and the union negotiated the MA position and wage rate solely on the basis of job content. Forsberg points to nothing in the record concerning these negotiations which raises a material issue concerning the company's alleged discriminatory intent.
 
 
 45
 Nor does any of Forsberg's other "evidence" establish a material issue of fact as to the company's intent to discriminate. The 1973 consent decree that expired in 1979 is not in the record. Even if we were to take judicial notice of it, this fourteen-year old expired consent decree fails to raise a material issue of fact relevant to the 1980 and 1983 negotiations. Similarly, general and conclusory allegations concerning the alleged discriminatory history of AT & T fail to raise a material issue of fact. Finally, we refuse to consider Forsberg's quotations from a 1971 EEOC brief, which was not introduced into evidence in the district court and is not in the record on appeal. See Fed.R.App.P. 10(b)(2).
 
 
 46
 Although courts should use summary procedures judiciously when intent is an issue, Foster v. Arcata Associates, Inc., 772 F.2d 1453, 1459 (9th Cir.1985), cert. denied, 475 U.S. 1048, 106 S.Ct. 1267, 89 L.Ed.2d 576 (1986); Douglas v. Anderson, 656 F.2d 528, 535 (9th Cir.1981), purely conclusory allegations of alleged discrimination, with no concrete, relevant particulars, will not bar summary judgment. Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.), cert. denied, 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985).
 
 C.
 
 47
 Forsberg also claims that the district court erred in granting summary judgment to the company on her claim that the company violated Oregon's FEPA, which prohibits sex discrimination in employment.[1] Forsberg relies on Frazier v. Minnesota Mining & Manufacturing Co., 82 Or.App. 328, 728 P.2d 87 (1986) (Frazier ), and argues that Oregon has a "less restrictive" standard under the Oregon FEPA than Congress has for Title VII. Thus, Forsberg argues, the district judge committed reversible error when she stated that she was granting summary judgment on Forsberg's Oregon FEPA claim for the same reasons that she was granting summary judgment on the federal EPA and Title VII claims.
 
 
 48
 Oregon, however, has expressly adopted the Supreme Court's interpretation for establishing a prima facie case of sex discrimination under the Oregon FEPA. Henderson v. Jantzen, Inc., 79 Or.App. 654, 719 P.2d 1322, 1324 (1986) (Henderson ), (citing Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (Burdine )), rev. den., 302 Or. 35, 726 P.2d 934 (1986). Burdine reiterated the requirements set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), for a plaintiff to establish a prima facie case for disparate treatment in violation of Title VII. Burdine, 450 U.S. at 253, 101 S.Ct. at 1093. Nothing in Henderson or Frazier indicates that the Oregon court intended to establish a "less restrictive" standard under Oregon law for establishing a prima facie case. Since we have already concluded that the district court properly granted summary judgment on Forsberg's disparate treatment claim under Title VII, we also conclude that the district court properly granted summary judgment on Forsberg's Oregon FEPA claim.
 
 III
 
 49
 The parties also raise objections to several pretrial orders.
 
 A.
 
 50
 Forsberg contends that the district court abused its discretion in denying class certification for all past, present, and future similarly situated female MAs. She also contends that the district court erred in failing to rule on her motion requesting that the court provide notice to other MAs alerting them that they could consent to be plaintiffs. Because we affirm the summary judgment as to all Forsberg's claims, any issue relating to the certification of a class of similarly situated plaintiffs with identical claims is moot. Hence, we need not reach either of these issues.
 
 B.
 
 51
 Forsberg calls our attention to the district court's failure to allow certain discovery. First, she argues that the district court abused its discretion in failing to decide, after an in camera review, whether to permit her to review the final two pages of the company's occupational job evaluation plan. Second, she argues that the district court abused its discretion when it refused to permit her discovery concerning the company's salaried positions, which she wished to contrast with information concerning hourly positions.
 
 
 52
 We need not reach either of these issues. Even if the district judge did abuse her discretion in not permitting these two discovery requests, the information could not have altered our conclusion pertaining to whether the two jobs being compared required substantially equal skill or whether the company engaged in intentional discrimination.
 
 C.
 
 53
 The company asks us to decide whether the district court erred in realigning the union and the union locals as nonaligned parties for the limited purpose of ensuring that any relief Forsberg obtained would be binding on the union and the locals and would not subject the company to inconsistent obligations. We also need not reach this issue, because by affirming the summary judgment against Forsberg as to all claims, these two concerns that prompted the company to seek realignment of the union and the locals in the first place have become moot.
 
 D.
 
 54
 Forsberg contends that the district court erred in refusing to assert pendent jurisdiction over her claims arising under the Oregon Equal Pay Act[2] and Oregon Wage Claim Statute.[3] The district court asserted pendent jurisdiction over Forsberg's Oregon FEPA claim, but refused to do so over Forsberg's claims under these other two state statutes because the claims arising under these latter two statutes raised issues that were more appropriately settled by the Oregon state courts. Forsberg, 623 F.Supp. at 127-28.
 
 
 55
 "[P]endent jurisdiction is a doctrine of discretion, not of plaintiff's right." United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). Thus, we review the district court's refusal to exercise pendent jurisdiction for an abuse of discretion. See In re Nucorp Energy Securities Litigation, 772 F.2d 1486, 1491 (9th Cir.1985).
 
 
 56
 The district court's entry of summary judgment on the federal claims did not deprive the court of pendent jurisdiction to hear the state claims. See id. at 1490. A choice still had to be made. A district court, in exercising its discretion to entertain pendent state claims, should consider those aspects identified as significant in Gibbs. See Carreras v. City of Anaheim, 768 F.2d 1039, 1042 n. 1 (9th Cir.1985). However, a district court is not foreclosed from giving weight to other considerations that may be relevant to the particular case. For example, a district court could consider whether the state claims pose novel and unsettled questions of state law. See Doe v. Board on Professional Responsibility of District of Columbia Court of Appeals, 717 F.2d 1424, 1428 (D.C.Cir.1983) (per curiam).
 
 
 57
 The district court refused to exercise pendent jurisdiction over Forsberg's Oregon Equal Pay Act claim because the Oregon courts had not interpreted the Act to any significant degree, and the district court refused to assume that the Oregon legislature intended the state act to parallel the federal act. Forsberg, 623 F.Supp. at 127-28. In addition, the district court did not wish to interpret the legislature's intent concerning the scope of damages and the right to a jury trial under the Act. Id. at 128.
 
 
 58
 Forsberg argues that the Oregon courts issued three opinions before the district court decision which provide sufficient guidance to interpret the Oregon Equal Pay Act. Forsberg, however, cites only City of Portland v. Bureau of Labor and Industry, 61 Or.App. 182, 656 P.2d 353 (1982) (in banc) (City of Portland ), modified, 64 Or.App. 341, 668 P.2d 433 (1983) (in banc), aff'd in part, rev'd in part, 298 Or. 104, 690 P.2d 475 (1984) (in banc). In addition, Forsberg argues that a recent Oregon Court of Appeals opinion, Smith v. Bull Run School District No. 45, 80 Or.App. 226, 722 P.2d 27 (1986) (Smith ), rev. denied, 302 Or. 86, 726 P.2d 1185 (1986), which the court decided after the district court's decision, sheds significant light on interpreting the Act. Forsberg contends that City of Portland and Smith provide sufficient guidance to interpret the Oregon act.
 
 
 59
 Even though City of Portland and Smith do help in interpreting the Oregon Equal Pay Act, neither addresses the scope of damages the Oregon legislature intended under the Act. Because of this novel and unsettled question of state law, we conclude that the district judge did not abuse her discretion in refusing to assert pendent jurisdiction over this claim.
 
 
 60
 The district court refused to exercise pendent jurisdiction over Forsberg's Oregon Wage Claim Statute claim, because the court would have had to decide whether the Oregon legislature intended to allow a private right of action under the statute and whether the legislature intended to allow the statute to include pay discrimination complaints under the Equal Pay Act. Forsberg, 623 F.Supp. at 128. Forsberg admits that there have been no Oregon cases that have attempted to resolve these issues, but asserts that the court should have exercised pendent jurisdiction anyway. Given these unresolved issues of state law, we conclude that the district judge did not abuse her discretion in refusing to assert pendent jurisdiction.
 
 IV
 
 61
 The company contends that the district court erred when it failed to award the company attorneys' fees. The company sought attorneys' fees of $261,734, litigation expenses of $9,670.85, and consultants' fees of $34,088.89 from Forsberg, other opt-in plaintiffs, and union Local 9201. Cf. Ste. Marie v. Eastern Railroad Association, 497 F.Supp. 800, 812-14 (S.D.N.Y.1980) (counsel for prevailing Title VII sex discrimination plaintiff awarded attorneys' fees, litigation expenses, and costs of experts under 42 U.S.C. Sec. 2000e-5(k)), rev'd on other grounds, 650 F.2d 395 (2d Cir.1981). The company contends that it is entitled to attorneys' fees and these related expenses under 42 U.S.C. Sec. 2000e-5(k),[4] Or.Rev.Stat. Sec. 659.121(1) (1985),[5] and as sanctions under Fed.R.Civ.P. 11. No request was made pursuant to Fed.R.Civ.P. 54(d).
 
 
 62
 We review an order denying these costs including attorneys' fees under these authorities for an abuse of discretion. See Huettig & Schromm, Inc. v. Landscape Contractors Council, 790 F.2d 1421, 1427 (9th Cir.1986) (rule 11); National Organization for Women v. Bank of California, 680 F.2d 1291, 1293 (9th Cir.1982) (per curiam) (42 U.S.C. Sec. 2000e-5(k)). In order for a prevailing defendant to recover these expenses under any of the three provisions, the district court must find that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith. Christianburg Garment Co. v. EEOC, 434 U.S. 412, 421, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978) (42 U.S.C. Sec. 2000e-5(k)); Unioil, Inc. v. E.F. Hutton & Co., Inc., 809 F.2d 548, 557 (9th Cir.1986) (rule 11); Payne v. American-Strevell, Inc., 65 Or.App. 265, 670 P.2d 1065, 1066 (1983) (Or.Rev.Stat. Sec. 659.121(1)).
 
 
 63
 The district court concluded that the company was not entitled to an award, even though the court granted summary judgment on all claims. The district judge stated that she had considered many difficult factors in reaching her decision. We agree that this case presented numerous difficult issues that were not without foundation. The district judge did not abuse her discretion in refusing to award attorneys' fees and other expenses pursuant to section 2000e-5(k), section 659.121(1), or rule 11.
 
 
 64
 AFFIRMED.
 
 
 65
 PREGERSON, Circuit Judge, dissenting.
 
 
 66
 I dissent from that part of the majority's opinion that affirms the district court's grant of summary judgment for the defendant on the federal Equal Pay Act (EPA) claim, 29 U.S.C. Sec. 206. Forsberg contends that the defendant violated the EPA by paying Maintenance Administrators (MAs) less than Test Desk Technicians (TDTs). MAs are predominantly women; they are paid according to the G-8 clerk rate. TDTs, by contrast, were predominantly male. Classified as "craft" workers, TDTs earned over one hundred dollars per week more than MAs.
 
 
 67
 As the majority recognizes, the critical question for Forsberg's EPA claim is whether the Test Desk Technician (TDT) job is "substantially equal" to the Maintenance Administrators' (MA) job. At 1413. Two jobs are "substantially equal" if they require equal skill, equal effort, equal responsibility, and are performed under similar working conditions. 29 C.F.R. Sec. 1620.14(a) (1987). The majority concludes that the skills required for the MA position are not, as a matter of law, substantially equal to those demanded by the former TDT position and thus affirms the grant of summary judgment. At 1411. I disagree, and would hold that Forsberg has raised genuine issues of fact regarding the substantial equality of the two positions.
 
 
 68
 The majority only reached one of the four criteria necessary to establish that two jobs are substantially equal under the EPA--the criterion of skill. In finding that the MA job does not require skill substantially equal to the TDT job, the majority relies primarily on the MA's inability to operate the TDT testboard, and determines that, therefore, "the MA job obviously does not require the analytical, 'puzzle-solving' skills that the TDT job requires." At 1416. However, the fact that the MAs are not trained to operate the testboard or perform the exactly identical tasks required of the TDTs does not necessarily mean, as the majority indicates, that the jobs do not demand substantially equal skill. Such reasoning would preclude a finding of substantial equality whenever technological advances lead to the use of updated equipment in a given job. The EPA regulations do not comport with this view. 29 C.F.R. Sec. 800.123 expressly states that "the performance of jobs on different machines or equipment would not necessarily result in a determination that the work so performed is unequal within the meaning of the statute if the equal pay provisions otherwise apply...." Accepting defendant's argument, as the majority does, could lead to absurd results. For example, as plaintiffs point out, a bus driver who operates a modern vehicle with an automatic transmission, and does not know how to drive a manual bus, would not hold a job "substantially equal" to a bus driver of an earlier era who could and did drive a bus with a manual transmission.
 
 
 69
 Defendants dispute the aptness of the bus driver analogy; they argue that, in fact, the TDT and MA positions do require distinct skills. But our job is not to choose between these two assessments of the jobs. On a motion for summary judgment, it is enough that the plaintiff has presented evidence that supports a finding of "substantial equality." Anderson, 106 S.Ct. at 2507. Plaintiff has met that burden here. She has provided testimony by affidavits, from a variety of sources,[1] that the two jobs do involve substantially equal skill. Moreover, the majority opinion itself raises an issue regarding the degree to which the two jobs differ in their need for analytical problem solving skills. The majority notes that "it is through this report [produced by the MLT-2 computer, the machine that ultimately replaced the testboard used by the TDTs] that an MA first learns that a customer is having trouble with his or her telephone line. The MA then analyzes the report and answers the MLT-2's recommendation." At 1412 (emphasis added). Similarly, the TDT, after performing the manual tests, "would then analyze the results and dispatch a crew to solve the problem." At 1411.
 
 
 70
 The majority's discussion of the other sub-factors relevant to determining substantial equality of skill--education, training, and experience--likewise demonstrates that these issues are disputed. At 1414. The majority's factual determination that the two jobs require different skills was inappropriate on a motion for summary judgment. Given this conflicting evidence the trier of fact, not the court, should decide whether the jobs of TDTs and MAs are substantially equal. Spaulding, 740 F.2d at 697.
 
 
 71
 Because the majority found that the TDT and MA jobs did not require substantially equal skill, it never reached the question of whether Forsberg raised a genuine issue of fact regarding the three other criteria--effort, responsibility, and working conditions--necessary for finding substantial equality under the EPA. I believe Forsberg raised a genuine issue of fact regarding each of these factors. Plaintiff presented evidence in her affidavits that disputed defendant's contention that, in terms of effort, MAs produce less and run fewer tests than TDTs. As for responsibility, plaintiff introduced testimony that MAs "analyze, diagnose, and cure customers' telephone malfunctions on the basis of reports produced by their machines....," as did TDT's. Finally, PNB apparently does not dispute the equality of working conditions for the two positions.
 
 
 72
 Forsberg has raised genuine factual issues regarding each criterion required under the EPA to establish "substantial equality" of jobs. For the reasons set forth above, I dissent.
 
 
 
 [1]
 Or.Rev.Stat. Sec. 659.030(1)(a) provides:
 (1) [I]t is an unlawful employment practice:
 (a) For an employer, because of an individual's ... sex ... if the individual is 18 years of age or older and under 70 years of age, ... to refuse to hire or employ or to bar or discharge from employment such individual. However, discrimination is not an unlawful employment practice if such discrimination results from a bona fide occupational requirement reasonably necessary to the normal operation of the employer's business.
 
 
 [2]
 Or.Rev.Stat. Sec. 652.220(1) and (2) provides:
 (1) No employer shall:
 (a) In any manner discriminate between the sexes in the payment of wages for work of comparable character, the performance of which requires comparable skills.
 (b) Pay wages to any employe at a rate less than that at which the employer pays wages to employes of the opposite sex for work of comparable character, the performance of which requires comparable skills.
 (2) Subsection (1) of this section does not apply where:
 (a) Payment is made pursuant to a seniority or merit system which does not discriminate on the basis of sex.
 (b) A differential in wages between employes is based in good faith on factors other than sex.
 
 
 [3]
 Or.Rev.Stat. Sec. 652.355 provides:
 (1) No employer shall discharge or in any other manner discriminate against any employe because:
 (a) The employe has made a wage claim or discussed, inquired about or consulted an attorney or agency about a wage claim.
 (b) The employe has caused to be instituted any proceedings under or related to ORS 652.310 to 652.405.
 (c) The employe has testified or is about to testify in any such proceedings.
 (2) Any person who discharges or discriminates against an employe in violation of subsection (1) of this section shall be liable to the employe discharged or discriminated against for actual damages or $200, whichever is greater. In any action under this subsection, the court may award to the prevailing party, in addition to costs and disbursements, reasonable attorney fees.
 
 
 [4]
 42 U.S.C. Sec. 2000e-5(k) provides:
 (k) In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person.
 
 
 [5]
 Or.Rev.Stat. Sec. 659.121(1) provides:
 Any person claiming to be aggrieved by an unlawful employment practice prohibited by ORS 659.030, 659.035, 659.227, 659.270, 659.295, 659.330, 659.340, 659.410, 659.415, 659.420 or 659.425 may file a civil suit in circuit court for injunctive relief and the court may order such other equitable relief as may be appropriate, including but not limited to reinstatement or the hiring of employes with or without back pay. Back pay liability shall not accrue from a date more than two years prior to the filing of a complaint with the Commissioner of the Bureau of Labor and Industries, pursuant to ORS 659.040, or if no such complaint has first been filed, then, more than two years prior to the filing of the civil suit provided for in ORS 659.040, 659.045, 659.095 and this section. In any suit brought under this subsection, the court may allow the prevailing party costs and reasonable attorney fees at trial and on appeal.
 
 
 [1]
 The majority refused to consider the affidavit of Forsberg's expert, Dr. Rollins, because Forsberg did not specifically call the court's attention to it in her opposition to defendant's motion for summary judgment. However, plaintiff had presented the affidavit to the court on the class certification issue. Rule 56(c) allows for grants of summary judgment based on documents "on file" with the court. Fed.R.Civ.P. 56(c). Moreover, in its opposition to defendant's motion for summary judgment, Forsberg stated that she "relies on all factual submissions currently before the Court, in the form of deposition testimony, affidavits, summaries of facts in other memoranda." Plaintiff's Reply Brief at 3. For this reason, I believe the majority erred in failing to consider this affidavit. However, even without this affidavit, plaintiff has raised a genuine issue of fact on the substantial equality of skill required of TDTs and MAs based on the other evidence presented